In re BARDE et al.

(District Court, D. Oregon. September 8, 1913.)

No. 2,288.

1. BANKRUPTCY (§ 384*)—COMPOSITION—CONFIRMATION—BEST INTERESTS OF CREDITORS—EVIDENCE.

Where a proposed composition with creditors has the approval of a majority of such creditors, such fact in itself is prima facie evidence that it is for the best interests of all.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. § 384.*]

2. BANKRUPTCY (§ 384*)—COMPOSITION—CONFIRMATION—OBJECTIONS—BURDEN OF PROOF.

Bankr. Act July 1, 1898, c. 541, § 12d, 30 Stat. 549 (U. S. Comp. St. 1901, p. 3426), provides that a proposed composition shall be confirmed if the judge is satisfied that the bankrupt has not been guilty of any acts, or failed to perform any of the duties which will bar his discharge. Held, that the burden is on the objecting creditor to establish by a clear preponderance of the evidence that some valid reason exists for denying the bankrupt's discharge, in order to prevent a confirmation of a composition.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. § 384.*]

3. BANKRUPTCY (§ 384*) — COMPOSITION — CONFIRMATION — OBJECTIONS — GROUNDS.

Bankr. Act July 1, 1898, c. 541, § 12d, 30 Stat. 549 (U. S. Comp. St. 1901, p. 3426), provides that a composition shall be confirmed by the judge if satisfied that the bankrupt has not been guilty of any acts or failed to perform any of the duties which will bar his discharge, and section 14b, subd. 2, declares that a bankrupt shall be entitled to a discharge unless he has with intent to conceal his financial condition destroyed, concealed, or failed to keep books of account or records from which such condition might be ascertained. Held, that such latter provision is available as an inhibition to confirmation to a composition with creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. § 384.*]

4. BANKRUPTCY (§ 384*)—COMPOSITION—OBJECTIONS—FAILURE TO KEEP BOOKS—EVIDENCE.

Evidence held to require a finding that bankrupts had failed to keep books of account, with intent to conceal their financial condition, and hence that they were not entitled to confirmation of a proposed composition as against the protest of certain creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 590–592; Dec. Dig. § 384.*]

In Bankruptcy. In the matter of bankruptcy proceedings of M. Barde and J. Levitt, individually and as partners, doing business as Barde & Levitt. Application for confirmation of a proposed composition denied.

Bauer & Greene and A. H. McCurtain, all of Portland, Or., for objecting creditors.

Giltner & Sewall and Alex. Sweek, all of Portland, Or., for bankrupts.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WOLVERTON, District Judge. This is a proceeding on a proposed composition with the creditors of the copartnership of Barde & Levitt. The assets of the bankrupts, both as partners and as individuals, as appears by the appraisers' report, amount to $112,908.50. The proved claims, as appears from the report of the referee in bankruptcy, aggregate $132,872.12, being 147 in number. Besides these, there are claims, five in number, which have been allowed, amounting to $488.65. Other claims have been scheduled, 17 in number, amounting to $3,885.60, but have not been proven.

Subsequent to adjudication and examination of the bankrupts, they offered a composition of 45 per cent. of their liabilities, and later deposited with R. L. Sabin, the duly elected trustee, the sum of $62,029.-57 with which to meet such offer.

Certain creditors, seven in number, whose claims aggregate $8,-362.72, have interposed objections, assigning numerous grounds why confirmation of the composition should not be had. Among these objections is one that the bankrupts, with intent to conceal their financial condition, failed to keep proper books of account so that their business condition might be ascertained.

In the view I take of the controversy, after a careful and thorough reading and study of the record, it will be unnecessary to discuss other objections except incidentally.

One of the objections goes to the insufficiency of the amount of money deposited as a consideration to be paid by the bankrupts to their creditors under the proposed composition. It might be that upon a close estimate the amount deposited would be short of the requirements of the statute, but the difference cannot be large as compared with the magnitude of the transaction, and the point may well be waived that the merits of the controversy may be considered.

A brief statement of the facts attending the formation of the partnership of Barde & Levitt will be instructive and aid materially in the solution of the question which is brought into the record by the objections, and which I deem vital to the cause in the present aspect.

For from 15 to 20 years prior to entering into partnership with Levitt, Barde had been engaged in the junk business, and had evidently prospered in that line, as he had accumulated a considerable property; the partnership with Levitt having been entered into early in August, 1912. Barde's sons were engaged in business with him part of this time. The eldest son, J. N. Barde, entered into business with him about ten years ago, at which time young Barde was of the age of 16 years. Barde says he then took his son in as half partner, and the firm was called M. Barde & Son. Later—that is, in 1908—he took in his second son, L. B., also as a partner; the firm name being changed to M. Barde & Sons. L. B. Barde was at the time 16 years of age. When asked what proportion this son was to have in the firm, Barde replied:

"I was supposed to give him a third, each of them. Q. The other boy had previously had a half? A. Well, it wasn't exactly a half. I didn't promise him exactly a half. I told him to go on and buy it out and be a partner, and then the second boy growed up and we took him in and supposed to be partners all together. Q. You one-third, and J. N. Barde one-third? A. Yes."

Each of these boys is alleged to have put in $2,000 when he entered the firm; they having accumulated the money or being entitled thereto by reason of having worked for their father in the business during their younger days. Barde asserts that still later, namely, about five or six months previous to the time of taking his testimony, another son, Harold, still younger than the others, was taken in and became a partner; this son being about 17 at the time. Harold, however, received stock in a corporation previously formed under the name of M. Barde & Sons, but was really never a partner. He is said to have put about $2,000 into the business also; this being an estimate of what was due him for services rendered the firm in his younger days. The capital stock of the corporation was fixed at $100,000, divided into 1,000 shares of $100 each. The property of the partnership was turned into the corporation, and the stock issued in payment therefor. The shares of stock were subscribed for, and divided among the three partners as follows: M. Barde, 600 shares; J. N. Barde, 250 shares; and L. B. Barde, 150 shares. The incorporation was had and the stock assigned about August 13, 1912. Later, namely, in December, 1912, the shares of stock, by mutual understanding between the parties concerned, were reissued and reassigned as follows: To M. Barde, 200 shares; J. N. Barde, 350 shares; L. B. Barde, 200 shares; Harold Barde, 150 shares; and to J. N. and L. B. Barde, 100 shares in trust. The 100 shares in trust, it is explained, were to secure the payment of money that Barde owed the corporation.

Barde claims by his testimony that the first issue and assignment of the stock was merely temporary, and that the shares were to be so held until the parties to the arrangement "were straightened out," and further says:

"Now, that is the way it was. It was made up before I left till I would come back, then we will straighten that matter out between the children. * * * That was just temporary until we would meet again and we would divide it among the three boys."

The words "before I left" had reference to his going East with Levitt to purchase merchandise for the business of Barde & Levitt.

Jacob Levitt had a store in East Portland, in charge of his brother, S. J. Levitt, which he had been conducting about two years, and a store in Oregon City. This latter he had owned for a much longer time. He says his stock in Oregon City at the time he entered into partnership with Barde was worth $24,000 or $25,000, and his stock in East Portland inventoried about $5,000; that he valued his entire stock, held in both places, at $30,000. At the time his liabilities were $18,000 or $19,000 for merchandise, and at banks in amounts sufficient to carry them up to $36,000 and over. So that, adding to his assets $2,000 for accounts receivable, it left him with liabilities exceeding his assets in a sum above $4,000. Barde was on some of Levitt's paper, and was aware approximately of Levitt's true financial condition. Levitt's stock was contributed to the business, and immediately he and Barde borrowed considerable sums of money at the banks with which to carry on the venture. They moved the East

Portland stock to Salem, but in the meantime they established what they term a chain of stores—one at Salem, one at Corvallis, and later one at Hood River, and partially made arrangements for one at Eugene. Having made provision for opening these stores, both Barde and Levitt went East to purchase stock, and purchased heavily on the usual credit. In the time between that date and the failure, February 14, 1913, there was added to the old stock, according to the testimony of Alexander Young, the expert accountant employed to expert the accounts of the firm, $99,981.50, making a grand total of stock received, including the original stock of $30,000 and the purchase of a store at Salem for $2,900, of $132,881.50. The appraisement of stock on hand at time of failure is $66,582.31. The stock representing the difference between these two amounts is not satisfactorily accounted for, and, even aided by the verbal statements of Levitt, there is yet a large sum wholly unaccounted for. Barde knew but little about the business, and S. J. Levitt, who is styled the manager and was given general oversight concerning it, does not enlighten us greatly.

This brings us to the inquiry as to the manner in which the books of the concern were kept. Miss Levitt, a sister of Levitt, the partner, was employed at Oregon City as stenographer to Levitt, and bookkeeper. She kept a merchandise ledger, showing the invoices of merchandise purchased and payments made upon merchandise. This was practically the only regular book of account kept for the entire business conducted at all the stores. As to the bookkeeping, Levitt testifies as follows:

"Q. Who kept that ledger? A. It was my sister. I started that ledger myself, and then my sister would take the bill and put it into that ledger. For instance, we got in a bill of goods, why she would put in the ledger, and if I sent away a check she would credit the account with so much. That is all the bookkeeping I did. Q. She posted from the bill or invoice directly into the ledger? A. Into the ledger. Q. Didn't it contain any cash account, that ledger? A. No. Q. Nor an expense account? A. No. Q. Nor rent account? A. No, it was all done by checks. Q. Or a salary account? A. No. Q. None of that was entered in this ledger? A. No. Q. Was it entered in any other book? A. Well, I used to have a little book there to keep a memorandum of my salaried men, what they were drawing and what they were getting paid."

Further on he was interrogated:

"Q. So I understand, then, you did not keep a regular set of books at any of these stores? A. No. Q. Nor a general set of books at any of the stores or at Oregon City? A. No; only this ledger I kept at Oregon City."

And again:

"Q. How did you keep the financial accounts in these branch stores, how was it kept? Just explain the mode. A. Well, it was just kept this way: It was a little daily sales—we had registers in every place, National Cash Registers, and sales were taken off of that register, you know. Q. And entered into daily sales books? A. And entered that into the daily sales book. Or they didn't have them sales book, they had them sales slips; not regular sales books; and during the day they would have a place there where to put them, and in the evening they would go more on the register than they would on those sales slips. Q. They checked up the sales slips with the cash register total? A. Well, now, I don't know as to that, Mr. Greene. Q. Did you ever

207 F.—42

do it any? A. In my own store? Q. Yes; or the other stores either? A. Well, I don't know. Q. You don't recollect? A. I don't recollect whether I ever done it. I didn't do it. Q. What did you do with the cash received during the day? A. Well, they used to deposit it in the bank every day. Q. The local bank? A. The local bank."

And later:

"Q. All the facts you have testified to here were merely gathered by the expert from the checks and the books and a little clue here and there, is that the situation? A. Yes, sir; that is as near as I can get at it. Q. You didn't keep the cashbook? A. I kept no books than what is here. Q. That's all the books you kept? A. Yes, sir. Q. You kept no cashbook? A. No, sir. Q. You kept no bills payable account? A. No, sir. Q. Any interest account? A. No, sir. Q. Any expense account? A. No, sir. Q. Any operating account? A. No, sir; nothing of that sort at all. Q. You never kept anything of that sort at all? A. I kept track of the checks I paid out, and had a daybook of the accounts credited, charge accounts, and my ledger; when I got in a bill of goods I put it in the ledger, and when the bill was paid I took it and put it in the file."

Alexander Young testifies as follows:

"Q. Tell the court, Mr. Young, whether or not the books, records, and documents kept by the bankrupts, Barde & Levitt, and examined by you, were and are such as to afford a basis for a determination of the financial standing of Barde & Levitt at the time they went into bankruptcy, or at any time covered by the books you examined? A. No such condition to allow doing that. Q. Are you able to say whether or not they kept such books or accounts as would enable any bookkeeper or accountant of ordinary intelligence and ability to determine their financial condition at any time during the period the books covered? A. If these are the books here, it is absolutely impossible. Q. You now have reference to the exhibits that have been introduced in this case, including the ledger and various books and documents and check stubs and canceled checks, and so forth? A. I do."

Mr. Kenneth Evans, an expert accountant employed by the bankrupts to make a statement of the condition of the assets and liabilities of the firm, testifies, as bearing upon the manner in which the books were kept, as follows:

"Q. Now go right along with your statement. A. There was no cashbook, consequently I could not make a statement of cash from any record. Taking the facts, they borrowed $42,200 from the banks, and they had no cash on hand at the time the partnership was formed, and they had received from the sales, cash sales, $34,000; they have handled actual cash during the six months of business $76,200. Q. What became of that money? A. Upon inquiry from Mr. Levitt and from some memos which he had, I learned that they had paid in remodeling the various stores: At Salem, $1,625; Corvallis, $645; Hood River, $250—in remodeling and fixing those stores up ready for their business, and occupancy. A total of $2,520. From Mr. Levitt's statement of what he paid his manager at each store, rent, lights, phone, advertising—not advertising, but rent, phone, light, heat and help—wages, I arrived at the total expense, operating expense at Salem, $5,844; Corvallis, $2,935; Oregon City, $7,503.88; Hood River, $250; a total operating expense of all stores, $16,522.88. Q. During what period? A. From August 12, 1912, to February 14, 1913. They tell me they had made a trip East at a cost of $3,000, and various other traveling expenses between the stores, $1,550, or a total traveling expense account of $4,550. They claimed to have paid out in addition in the neighborhood of $2,500—the interest they were paying at the banks for their loans, from what they told me. As near as I could figure it was $2,433.12. They paid from their receipts and loans, for merchandise, according to the merchandise ledger, $22,000, and Mr. Levitt

claims he had paid on old accounts. merchandise accounts, which were made previous to the partnership— Q. And assumed by the partnership? A. (Continuing) $15,500, or a total amount paid out for merchandise of $37,500. They claim to have paid for freight and express $3,500. They paid back to the banks on their loans, according to my previous statement, $4,650, and they withdrew and paid Mr. A. Levitt, $900; M. Blum, $575; Morris Goldblock, $346; R. Blum & Sons, $203—or a total of $2,024 withdrawn from the business for personal accounts. This would account for the entire amount of cash that they apparently had received and borrowed. Q. What is the total of their disbursements? A. $76,200. Q. This shows the amount of all moneys they received during the time they were in partnership? A. As near as I could arrive at it from the books and what inquiries I could make. * * * Q. Go on with your statement. A. From the information. and from the figures that I had previously secured, the statement of Barde & Levitt's balances at the close of the business would appear as follows: Assets, accounts receivable. $2,000; assets, account receivable from M. Klapper, Aberdeen, $7,000; merchandise stock as per inventory. $74,717—or a total of $83,717. Their liabilities for merchandise, $76,717: loans of banks, $53,800—or a total liability of $129,917, showing a deficit of $46,200. Now, I will state that one reason I was called in this matter was to put in some kind of writing or some shape, figures or a statement that these gentlemen could understand. It is apparent there is no books kept other than this one ledger. From that ledger I gave you the statements of the actual purchases and amounts paid back on those purchases. In endeavoring to account for this deficit of $46,200, I find that Mr. Levitt began with $30,000 worth of stock and $2,000 worth of accounts."

## On cross-examination he testified:

"Q. You said, I believe, on analyzing book 'Creditors' Exhibit 2,' you found it was wrongfully kept? A. Yes, sir. Q. You said in inquiring from Levitt you found he owed $15,000 for merchandise? A. That statement is wrong. Q. The only information you had on that subject is what Levitt said to you? A. In regard to what credits he was owing; yes, sir. Q. Did he show you any records or vouchers to prove his statements? A. I didn't go into the old books. I didn't know where they were. Q. You say the payment to George W. Bates & Co. and Oregon City Bank were not showed by the books? A. No, sir. Q. The only way you know about that is by what Levitt said to you? A. Yes, sir. Q. And you also stated said Levitt informed you that since then—that is, I suppose, meaning since the partnership was formed, and in the six months period they operated—were sums of money aggregating $42,200. Did you ascertain that figure from anything else than Levitt's statement? A. No, sir. Q. And you also stated that the total money borrowed from banks was $58,450 between August 12, 1912, and February 14, 1913? A. No, Mr. Greene, I said the total amount they had borrowed altogether was $53,800. Q. Did you learn that from any other source than the books? A. No, sir; I learned that from Mr. Levitt. Q. The books did not disclose those facts? A. No, sir. Q. You also say that Levitt informed you he had stock and fixtures at the time of the partnership of $30,000. Did he exhibit to you any records, or documents, to verify that figure? A. No, further than Mr. Barde stated also that was the correct amount. They both admitted the stock at that figure. Q. The two of them estimated the amount on hand at that time? A. Yes, sir. Q. There is no entry made in any book to sustain that fact? A. I didn't examine the old books. Q. Was it made in book 2 of Barde & Levitt? A. No, sir. * * * Q. You also in your statement include an estimate of the amount of sales or business transacted at the three stores, Oregon City, Corvallis, and Salem. Is there any definite record of that in any of the books or records or documents of the firm? A. There is a definite record of the deposits which indicate sales, but there is no record on the books showing the sales from day to day, except in the case of Oregon City. I found that. I found a memorandum or daybook in which it shows the cash receipts for the day, and in taking that off on an

adding machine I found it came to a little less than $10,000. Q. Why your estimate for Oregon City is $16,660. A. Oh, just a minute—that was at Salem I found that. Q. But there is no record of it in any other store? A. No, sir. * * * Q. You further said there was no cashbook kept by this firm. You found no cashbook? A. No, sir. Q. You reached the sales by their statements or methods you have stated? A. No, sir; absolutely without any statement at all, or any verification from Mr. Levitt. I arrived alone first, at the average business done by the bank book deposits from day to day. Excepting any one large amount which would apparently be receipts from other than the regular store. Q. Now, your estimate of the cost of fitting up the stores, what did you base that on? A. Merely took Mr. Levitt's statement. Q. Was there anything in the books or records to verify his statements? A. No, sir. Q. On what did you base your figures as to the traveling expenses for the eastern trip and other traveling expenses? A. Mr. Levitt's statement. Q. Was there anything in the books to verify that? A. No, sir. Q. And your estimate as to the money paid out for advertising, upon what did you base that? A. Mr. Levitt's statement. Q. Was there any verification in any of their books or records? A. No, sir. A reasonable apportionment of the three stores they operated and engaged in business. * * * Q. Do you want the court to understand then, Mr. Evans, that you could, from the records of this firm now in evidence and which you say you have examined, accurately determine their financial condition on the 14th of February, 1913, without any inquiry from anybody outside of the books and records themselves, or any explanation of any kind? Could you have done so? A. Probably not. Q. Did that firm keep such books of account as would enable a bookkeeper or accountant of ordinary ability to determine their exact financial condition at any one time during the six months' period that you went over their affairs? A. Not from the books."

It appears that, in order to establish a trade, the firm began selling at reduced prices, and later, finding themselves needing money with which to meet demands falling due, they sold at greatly reduced figures. One sale was had to one Klapper, amounting to $14,000, at 50 per cent. of the invoice price of the goods. While it is suggested that this sale was made for the purpose of meeting maturing obligations, it appears that it was on time running from three to six months, and could render them no aid in that direction. Whether the firm for any considerable time maintained normal prices, by which the usual mercantile profits were derived, is problematical. They claim they lost money in the business, and low prices and forced sales are excuses, among others given, for such loss.

[1] One of the objections urged why the composition should not be confirmed is that it is not for the best interests of the creditors. The proposed composition here has the approval of a large majority of the creditors, and this is in itself prima facie evidence that it is for the best interest of all. Were this the only objection, I should be inclined to direct a confirmation.

[2] The Bankrupt Act requires, among other things, that the composition shall be confirmed if the judge is satisfied that the bankrupt has not been guilty of any acts or failed to perform any of the duties which would bar his discharge. Section 12d. By the manner in which the proposition is stated, the act would seem to require the bankrupt to establish the fact that he is not amenable to it in this respect; but the burden of proof is cast upon the objecting creditor, and he must establish the fact by a clear preponderance of the evidence.

The bankrupt is entitled to a discharge unless he has, among other

things, "with fraudulent intent to conceal his true financial condition, * * * destroyed, concealed, or failed to keep books of account or records from which his true condition might be ascertained." Section 14b, subd. 2.

[3] Reading the two clauses together, this latter is available as an inhibition to a composition with creditors.

[4] From the testimony, it is very clear that the bankrupts have failed to keep books of account or records from which their financial condition could be ascertained. The testimony of the two accountants proves this, and they were experts in the business of stating accounts. But the crucial inquiry is: Did they so fail to keep such books and records with intent to conceal their financial condition? What their intent was in this respect is left for inference and presumption, and must be deduced from what they did and their manner of installing and conducting their business. At the beginning we find them embarking in a business that was even then hopelessly insolvent. Barde had never had any experience in that line of business, for he says himself, "I just started to learn the game." After borrowing some money at the banks, for their credit was good (probably more through Barde's connection with the firm than on account of Levitt), and paying some of Levitt's liabilities, they both went East, and purchased heavily, leaving S. J. Levitt in charge, as manager of the business, to install the chain of stores and put them in working order. About the time of entering into this partnership, if not shortly subsequent, Barde had his private business incorporated, and a division of the capital stock was had between himself and his two sons; he retaining the controlling interest. Later, in December, when it must have become apparent that the burden of liabilities of the firm was becoming oppressive, the capital stock of M. Barde & Sons was reissued and reassigned so as to include another son in the arrangement, leaving Barde without control of the stock, and, incidentally, 100 shares of the stock which Barde was entitled to were issued in trust to secure his indebtedness to the corporation. I do not say at this time that this latter transaction, including the reissue and reassignment of this stock among the partners receiving the same, was fraudulent as it respects the creditors of Barde & Levitt, for it is not necessary to pass upon that question now; but I allude to the incident as bearing upon the intent of Barde in not keeping a proper line of books in the partnership business. Further than this, goods were sold, for a good part of the time the business was conducted at least, at a loss to the concern, and the receipts from sales can only be approximated, and this from deposits made with the banks and from Levitt's statements of what was probably drawn out of the business to meet expenses and the private needs of the partners.

The business was conducted from the early part of August, 1912, until February 14, 1913, and within that time the merchandise shrank, taking the estimate of the bankrupts' own accountant, from $128,117, including freight estimated only, to $72,307, leaving a margin of $55,-817, and of this amount $6,810 is wholly unaccounted for. But, according to Mr. Young's report, the shortage in cash unaccounted for is much greater, running up to $28,415.67.

These matters are all pertinent for consideration on the question of

the intent with which Barde & Levitt failed to keep proper books of account of their business.

In the case of In re Alvord (D. C.) 135 Fed. 236, it was held by Platt, District Judge, that from failure to keep any books whatever it must be presumed that the bankrupts 'intended to conceal their financial condition. McKibbon, Driscoll & Dorsey et al. v. Haskell, 198 Fed. 639, 117 C. C. A. 343, a Court of Appeals case, is to the same effect. The court says in this case:

"The act of Congress proclaims the presumption and expectation of the law that honest merchants will keep account books which will disclose their true financial condition. In the absence of prevailing evidence to the contrary, every man is presumed to intend the natural and inevitable consequences of his acts."

In the case of In re Brod (D. C.) 166 Fed. 1011, the bankrupt was denied a discharge because of a shrinkage of $10,000 in his assets in a period of 13 months; he being unable to show from his books what became of the property.

Taking into consideration the entire history of this unfortunate venture, and the magnitude of the business to be transacted and which was in reality carried on, including a chain of mercantile stores at several points, the inference and presumption are so strong as to amount to absolute persuasion that Barde & Levitt, by their failure to keep suitable books of account, intended the natural and inevitable consequence of such failure, which was to conceal the true condition of their business and financial standing from their creditors.

The composition with the creditors will therefore not be confirmed.