## In re VAN DOREN.

### OAK PARK TRUST & SAVINGS BANK v. VAN DOREN.

### Nos. 5503, 5542.

Circuit Court of Appeals, Seventh Circuit.

Nov. 8, 1935.

Rehearing Denied Dec. 19, 1935.

Henry N. Shabsin, of Oak Park, Ill., for appellant.

J. Kentner Elliott, of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

This proceeding is one in which appellee filed her petition in the District Court, asking for an extension of time in which to pay her debts under the terms of section 74 of the Bankruptcy Act (11 USCA § 202). Appeal No. 5503 was taken under the provisions of section 24a of the Bankruptcy Act, as amended in 1926 (11 USCA § 47 (a), and appeal No. 5542 was taken under the provisions of section 24b, as amended in 1926 (11 USCA § 47 (b). Consolidation followed.

By its assignments of error appellant challenges many steps throughout the proceedings, but the entire matter turns on the sufficiency of the extension plan proposed by the debtor and which has had the approval of both the referee and the District Court.

860

Debtor's petition and schedules disclose that she is the owner of two parcels of real estate: Parcel No. 1 consisting of an apartment building located in Oak Park, Ill., and parcel No. 2 being her residence property located in River Forest, Ill. Early in the proceedings it was stipulated that a foreclosure decree had been entered in a state court against parcel No. 2 and that sale had been had and the property bid in by one Thane S. Cooley for the sum of $10,000 and that such purchaser was the holder of a master's certificate of purchase therefor; that a deficiency of $2,174.67 existed in such foreclosure proceeding; and that no plan of extension was contemplated by the debtor with reference to parcel No. 2 and that same should be treated as no part of her estate. Thereafter; parcel No. 2 was not under consideration except as it will hereinafter appear in connection with a supposed deposit of securities by the debtor in an effort to meet the requirements of subsection (e) of section 74 (11 USCA § 202 (e).

Parcel No. 1 with which debtor's plan of extension is mainly concerned is a three-story apartment building with nineteen apartments and one office and was constructed in 1928. The premises are encumbered by a first mortgage lien to secure outstanding bonds, in the principal sum of $73,375, at the time of the institution of this proceeding, of which sum $5,-000 principal amount had been subordinated. The premises were also encumbered by a second mortgage lien in the principal amount of $9,720 and a third mortgage lien in the principal amount of $4,917.32. Interest on all of said mortgages had been in default for a considerable time and there was an aggregate amount of interest due at the time of filing the petition in excess of $13,000, as well as several years delinquent taxes.

The Oak Park Trust & Savings Bank, appellant herein, is trustee under the first mortgage and is the owner of $21,975 of the first mortgage, unsubordinated bonds, and is an unsecured creditor for the sum of $290.

The plan provides: That the debtor be placed in possession of the mortgaged premises and have the management and control of the same, subject to supervision by a committee of the first mortgage bond-holders.

That all funds on hand at the date of confirmation shall be applied:

(1) In payment of costs incident to this proceeding.

(2) Account of such costs as might be allowed against the debtor in a previous foreclosure suit for the foreclosure of the first mortgage, and the balance, if any, to be applied on past-due taxes.[1]

That all sums to be derived from the operation of the mortgaged premises shall be deposited in a depository approved by the court and from such funds shall be paid the expenses of management, not exceeding 3 per cent. of gross income, the costs of operation, debts having priority over first mortgage, taxes and special assessments against the property as they become due, an indebtedness of $1,007.57 to John M. Smythe Company for certain furniture in the mortgaged premises and sold on conditional sales contract, such payment to be at the rate of $60 per month; and the balance to create a fund for payment of interest and to retire principal of unsubordinated first mortgage bonds in manner hereinafter stated.

That the date of payment of principal and interest of first mortgage bonds shall be extended to July 20, 1941.

That debtor will pay semiannually, beginning January 20, 1935, to owners of unsubordinated first mortgage bonds, on account of deferred interest, 2 per cent. per annum for the first two years of such extension, and 3 per cent. per annum for the last five years of such extension period.

That debtor will in like manner pay to the owners of subordinated, first mortgage bonds, on account of deferred interest, 2 per cent. per annum during the extension period.

That the date of payment of the principal and interest of the second mortgage lien shall be extended for a like period and debtor will for the first two years pay the holder of this lien 1 per cent. per annum, and for the last five years 2 per cent. per annum.

That the date of payment of the principal and interest of the third mortgage shall be extended for a like period, with no provision for any payment.

That before payment is made on any bond the bonds are to be presented to the debtor and the extension date and pay-

1 Debtor's report shows the "funds on hand" to be some $800, and the costs of this proceeding, including attorney's fees, approximately $3,000.

ments of interest are to be stamped thereon.

That when such interest payments as are to be made from the income of the property are made the balance is to be used to retire first mortgage bonds, and when such available sum has reached $1,-000 or more, a general call on all holders of first mortgage bonds is to be made and those bonds offered at the lowest price are to be retired from such fund, with the proviso that if such fund in any one year exceeds $2,000, any excess of $2,000 shall be used one-third to retire bonds and two-thirds to be prorated among first mortgage bondholders as additional payment account deferred interest.

That the date of payment of all unsecured claims shall be extended to July 1, 1941, and when all secured creditors are paid in full, they may be paid from income of the property.

In the determination of the question of whether the plan of extension includes an equitable and feasible method of liquidation for secured creditors and of financial rehabilitation for the debtor we shall limit ourselves, in the main, to a consideration of the manner in which the holders of the first mortgage bonds are affected, as they are the only ones complaining. There are two main approaches to this consideration:

(1) The inherent quality of the plan itself.

(2) The reasonable probability of debtor being able to effectively consummate it and, if so, the result.

Objection is made to the contemplated disposition of funds on hand at the time of confirmation, being accruals of income from the property after filing of debtor's petition and collected by her under order of court continuing debtor in possession. Appellant claims that payment from this fund of costs and claims having priority is improper as debtor was required under the provisions of subsection (e) of section 74 to deposit such sum under order of the court prior to asking for confirmation. It is to be noted that the debtor did, before asking for confirmation, deposit with the clerk of the court $500 in cash, an unrecorded quitclaim deed from the debtor and her husband to parcel No. 2, heretofore referred to, and an assignment of rents of $750 on the same property. In view of what transpired with reference to parcel No. 2, this court can reach no other

conclusion than that debtor's interest in parcel No. 2 was worth less than nothing. If it had any substantial value, it should have been carried through this proceeding as an asset of the estate. The cash deposit will be wholly insufficient to pay even the costs of the proceedings herein, if we include attorney's fees, as debtor's attorney has been allowed a fee of $2,500 for his services. In an endeavor to meet the requirements with reference to the deposit, the attorney has waived his right to the deposit of such sum before confirmation, but has not relinquished his right to be paid, and by the plan seeks to have payment made from the income of the property.

The provisions of section 74 (e) are very similar to the provisions of section 12b of the old Bankruptcy Act (11 USCA § 30(b), which provides:

"An application for the confirmation of a composition may be filed in the court of bankruptcy after, but not before, it has been accepted in writing * * * and the money necessary to pay all debts which have priority and the cost of the proceedings, have been deposited in such place as shall be designated by and subject to the order of the judge."

In the case of In re Frischknecht (C. C. A. 2d) 223 F. 417, in a composition proceeding, under the latter section, a deposit of money was made, under an order of court, sufficient to pay priority claims, costs of proceedings, and the consideration to be paid to the creditors. The trustee, his attorney, the attorney for the bankrupt, and the attorneys for the creditors waived the deposit of their fees. After the composition was confirmed, a balance remaining in the hands of the trustee was attached to pay a debt owing by the bankrupt which was not covered by the composition agreement. It was contended by the trustee that the surplus funds in his hands should first go to pay the fees, the deposit of which had been waived. The Circuit Court of Appeals overruled this contention, saying (223 F. 417, 420):

"The persons in whose interest the trustee seeks to have the attachment set aside are the persons who expressly waived in writing in the composition proceeding the deposit of any money to pay the expenses of administration. They are the attorneys for the bankrupt, the attorneys for the trustee, both as attorneys for the trustee and as attorneys for petitioning

creditors, and the trustee himself. If counsel choose to waive payment of their fees in order to make the sum so small that deposit can be made under a composition, so that the composition can be put through, this court is strongly opposed to their thereafter resuscitating their claims and insisting that they should be paid out of the estate. The bed they made for themselves they should lie in. If the bankrupt benefited by their waiver, being thus enabled to effect a composition, we think he is the one who should pay them."

We think the language applicable to the instant case, and counsel for the debtor having chosen to waive his right to have such sum deposited now has no right to have the same paid from the income of the mortgaged premises under the extension plan.

We believe also that the deposit of money or security for the payment of debts having priority cannot be passed so lightly and the same ordered paid from income during the course of administration of the extension plan. The plain language of the act is to the contrary.

Subsection (e) of section 74 (11 USCA § 202 (e) provides that:

"An application for the confirmation of a composition or extension proposal may be filed in the court of bankruptcy *after, but not before*, it has been accepted in writing; * * * and the money or security necessary to pay all debts which have priority unless waived and the costs of the proceedings, * * * have been deposited in such place as shall be designated by and subject to the order of the court."

The words "after, but not before" are words of emphasis, and command a strict adherence to the condition thus imposed. This should be so under the general scheme of section 74, for this section, under its extension provisions, does not contemplate an immediate liquidation, but a postponement, with the hope of ultimate payment and rehabilitation. If the debtor is so hopelessly involved as to be unable to meet the requirement of deposit, section 74 holds little of hope for her. What reasonable expectation would there be of an ultimate liquidation of first, second, and third mortgages and unsecured claims if she be unable to pay, or deposit security for, priority debts and costs? A debtor so hopelessly situated has been given a remedy by other sections of the Bankruptcy Act.

To thus further burden the security of the first mortgage bondholders would be only to further impair their lien. The avoidance of this, by the requirement that debtor deposit, before asking confirmation of an extension plan, a sum sufficient to cover costs of the proceeding and debts having priority, must be assumed to be the purpose of the Congress.

Appellee suggests that if the debtor must, as a condition precedent to confirmation, deposit an amount equal to the unpaid taxes, although her plan provides for payment of taxes, the primary purpose of section 74 has failed. If this be true, it can be no justification for the courts' distortion of the plain language of the act. Courts cannot by interpretation make Congress say one thing when it has in unequivocal language said another.

To now permit priority claims and costs to be paid from income as a part of the plan of extension would thwart the purpose of the act in its undertaking to open the door to those distressed debtors who could exhibit some reasonable expectation of paying their debts if given an extension of time. It was never intended that section 74 would afford relief by extension to those debtors so hopelessly involved as to hold no reasonable expectation of ability to pay in the reasonably near future. For such debtors, an extension is only a postponement of the day when general bankruptcy is to engulf them, and affords no genuine beneficial result either to them or their creditors. The debtor may hope for some temporary benefits by way of possession and management of the property, but this is not the benefit contemplated under section 74.

The record before us discloses that during a ten-month period of operation, from May 1, 1934, to March 1, 1935, the mortgaged premises produced a gross income of $7,387.50 with disbursements for the same period of $5,576.01, producing a net income of $1,811.49 or at the rate of approximately $2,170 per year. A few items appear in disbursements that are not properly chargeable to operation of the building, but an entirely optimistic estimate of the net revenue to be derived from the building would hardly exceed $2,500 per annum. It appears fair to estimate current taxes at $1,000 per year, and if no other items of disbursement were to be consid-

ered, this would not leave more than $1,500 per year to apply on the interest on first mortgage bonds which, if applied persistently throughout the period of extension, would fall more than $2,000 short of paying the interest at the rate contemplated by the plan on such unsubordinated first mortgage bonds.

The figures given have taken no account of insurance on the building and very little account of necessary repairs, replacements, and renewals on both building and contents. Neither can we lose sight of the fact that there is unpaid some $3,000 in back taxes, approximately $3,000 in costs to be paid from some source, a claim of John M. Smythe Company in excess of $1,000 for furniture in use in the mortgaged premises, interest on the subordinated first mortgage bonds, interest on the second and third mortgages, some $9,000 in accumulations of interest unpaid on the first mortgage unsubordinated bonds, together with deferred interest thereon during the extension period in excess of $15,000.

It is said that the debtor must make some of the payments from a source other than the income from the mortgaged premises and counsel calls our attention to the fact that debtor is in the real estate and insurance business; but other than this, the record gives no assurance, or even hope, of funds from any other source. Her testimony discloses that her real estate business is at a low ebb, but in the "last year or so" she thinks she has earned $2,500 to $3,000. She says her husband has no definite income and it is not reasonable to suppose that she will have very much available from her earnings to apply on her debts under the "plan."

With all of these things in mind, who will assert that the debtor's plan presents a feasible method of liquidation for secured creditors or that it is for the best interest of creditors generally or that it presents any hope of financial rehabilitation for the debtor? We think it is neither feasible nor in the best interest of the debtor. At the end of the seven-year extension, the first mortgage indebtedness will have grown instead of decreased and the lien of the first mortgage bondholders will have been greatly impaired.

Thus it will be seen that if the plan is consummated as debtor proposes and she realizes her fondest hopes and makes all payments contemplated, she will at the end of the extension period be overwhelmed with her debts, and liquidation is bound to follow as the night the day.

Other questions are raised by the assignments of error which are unnecessary to consider in view of our conclusions here reached. We think the record justifies the conclusion that, not only is the plan presented not feasible, but that debtor will be unable to propose any plan that would comply with the requirements of section 74, and for that reason the judgment of the District Court will be reversed and the cause remanded with instructions to deny debtor's petition and for such further proceedings as are consistent herewith.

Reversed and remanded.