## In re HESSION.

**CONTINENTAL ILLINOIS NAT. BANK & TRUST CO. OF CHICAGO et al. v. HESSION.**

No. 6438.

Circuit Court of Appeals, Seventh Circuit. July 7, 1938.

David F. Rosenthal, Herbert Becker, Carlos A. Spiess, and Thomas H. Alcock, all of Chicago, Ill., for appellants Continental Illinois Nat. Bank & Trust Co. of Chicago and Laura H. Beard.

Robert W. Wales, Sidney S. Gorham, Jr., and William Simon, all of Chicago, Ill., for appellee Nora Hession, debtor.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

TREANOR, Circuit Judge.

This is an appeal in a section 74, Bankr. Act, 11 U.S.C.A. § 202, proceeding challenging the District Court's order confirming debtor's plan for extension, on the ground that the approved plan is not feasible.

Debtor is the owner of an apartment building at 7800–7802 South Marshfield Avenue (and 1641 W. 78th Street), Chicago, which contains twelve apartments. Debtor and her husband acquired the property in 1924 for $82,000, the purchase price being paid for in cash and trades. A first mortgage securing $30,000 of bonds ($27,000 now outstanding) was executed April 15, 1930, maturing annually until 1935, with the Continental Bank as trustee. The bank now holds $24,000 of said issue. There is a $9,535 second mortgage, dated November 10, 1924, but not subordinated to the first mortgage, which is security for a $500 debt. The first mortgage carried interest at 6% (7% after default). Default occurred in October, 1932. The bank agreed to annual extensions, and in 1934 reduced the contract interest rate of 6% to 4½% and in November, 1935, further reduced it to 4%, interest paid at reduced rate being received as payment in full. Under these extensions debtor paid $40 monthly rent on her apartment and did the janitor work without charge. Foreclosure proceedings were instituted in December, 1936, and a receiver took possession. Section 74 proceedings were begun February 17, 1937.

Interest has not been paid since April 15, 1934. But at the time of the filing of the petition debtor had $636 on deposit with the bank, which the bank applied to payment of the interest maturing October 15, 1934.

Debtor scheduled $5,034 unsecured debts. The sole outside income of debtor consisted of $10 weekly payments to her by her son, and her husband's weekly salary of $37.

The parties have stipulated that the *fair cash market* value of the property is $27,000 (the amount of the principal of the mortgage) and that the net annual income (after payment of taxes, operating expenses and 3% interest) is $420 a year. One witness testified that approximately $2,000 is needed for repairs to place the building on a par with neighboring buildings and preserve the property. This expenditure would preserve the property and justify an *increase* of approximately $10 per month in the rental of each apartment. No repairs had been made on the building since the section 74 proceedings had been instituted.

Debtor's husband quitclaimed his interest in the property to the debtor shortly before this proceeding was instituted, and pursuant to the plan, debtor and her husband have executed and placed in escrow, a deed to the property to the Bank, to be recorded in the event of their default (continued for 60 days) under the plan.

The material features of the approved plan are:

(1) Two years' extension of maturity of principal and presently unpaid interest.

(2) Interest rate at 3% (balance of contract rate of interest extended with other extensions).

(3) Debtor to be placed in possession and given an apartment rent free (valued at $42.50) in exchange for services, and required to file quarterly statements with the Clerk of the U. S. District Court.

(4) Gross income to be used first for operating expenses, real estate taxes, interest on notes, sinking fund for payment of delinquent interest on first mortgage and retirement of bonds.

(5) The court retains jurisdiction of the debtor and the subject matter during the period of the extension.

The debtor deposited $496.23 for the payment of real estate taxes assessed against the property and $100 for the cost of the proceeding.

The referee after carefully scrutinizing the factual situation estimated that there would be $900 net income available for sinking fund.

The chief question here presented is one of feasibility of the debtor's proposed plan as approved by the referee and the

District Court. That we reasonably may doubt the .feasibility does not dispose of the question, since there are strong considerations in support of the conclusion of feasibility. To clarify the issue we have enumerated the arguments pro and con on the controversy of feasibility and present them here:

Pro:

(1) Debtor and her husband paid $82,000 in cash and trades for this property which' will be lost to them if this plan fails.

(2) The stipulated *fair cash market* value is now $27,000, from which it may be assumed that the real or intrinsic value of the property is greater than that sum.

(3) The plan contemplates only a short extension, namely, 2 years.

(4) The bank in the interim has in escrow the deed conveying property, which can be recorded after sixty days after default.

(5) The District Court retains jurisdiction of the debtor and the subject matter *during the period* of extension.

(6) There is a probability of ·the sum of $900 net income annually available from the operation of the property for sinking fund purposes (the stipulated amount available is $420).

(7) Possibility of appreciation of real estate values in Chicago, and rise in rental values.

(8) Estimated $2,000 necessary for repairs (not covered by plan) are probably not as necessary as bank's witness would intimate inasmuch as he thereafter states the property would be so improved. the rental on each apartment might be *increased* $10.

Con:

(1) No provision is made for repairs, estimated to require $2,000. No repairs have been made since Sec. 74 proceedings started in Feb. 1937.

(2) Bank has granted voluntary extensions twice since 1932 and has reduced the interest rate twice and yet debtor has been unable to rehabilitate self, and there is no reason to believe she will be more fortunate in the future.

(3) There have been no consents to the plan.

(4) Property is now worth $27,000 which is the amount of the mortgage, and therefore it is not equal to the mortgage debt augmented by unpaid interest, and there is probability of acceleration of deterioration and depletion in absence of repairs.

(5) Postponement of half of the contract rate of interest (6%) until termination of the extension is claimed to be violative of creditors' constitutional rights.

(6) The small amount available ($420) from operation of the property will not be of much help, not being even equal to the postponed half of the i̲n̲terest rate.

■ This court several times has passed on the feasibility of plans for extension under Section 74, but has recognized the impossibility of attempting to state any definite rule or test of general applicability. An order approving a plan of extension was reversed when the facts were such that this court could say "that if the plan is consummated as debtor proposes and she realizes her fondest hopes and makes all payments contemplated, she will at the end of the extension period be overwhelmed with her debts, and liquidation is bound to follow."[1] And in the opinion in the foregoing case this court pointed out that while the purpose of the act was "to open the door to those distressed debtors who could exhibit some reasonable expectation of paying their debts if given an extension of time" still such purpose did not include merely the granting ·of "some temporary benefits by way of possession and management of the property." And in Re Augustyn[2] this court recognized the materiality of "a lack of good faith" but also pointed out that the District Court was "not confined to a consideration merely of the honesty of purpose of the debtor" and was not bound to "retain a proceeding which gave promise only of a 'visionary or impracticable scheme for resuscitation.' "

■ But all our decisions recognize the important fact that an appellate court does not pass upon the feasibility of a plan as an original question and that the question of feasibility presents most delicate questions of fact in respect to which the trial court's conclusion must stand unless we can say that the debtor's full performance of all the duties imposed by the plan cannot reasonably result in more than a temporary postponement of the day of liquidation with ·consequent increase of hazard for the creditors. As stated by this court in Re Van Doren, supra, the postponement by the plan of performance of the debtor's obligations must be a "postponement, with the hope of ultimate payment and rehabilitation;" and there must be "facts to support hopes."

The following statement aptly expresses our judgment of the merits of this appeal.[3]

"All of this contemplates vigilance on the part of the court. The plan must not

[1] In re Van Doren, 79 F.2d 859, 863.

[2] 87 F.2d 577, 579.

[3] In re Llewellin, 7 Cir., 86 F.2d 588, 590.

be viewed as a paper plan—a theoretical solution of a present pressing problem. If the obligations of debtor are not met or the default satisfactorily explained, action to protect mortgagee must follow immediately. This we think the plan contemplates.

"*As an appellate court we are not called upon to pass upon the feasibility of this plan as an original proposition. We may have grave doubts as to its feasibility. The determination of that matter was the District Court's function.* He was in a better position than we (certainly in as good a position), and he found the plan was feasible. The evidence does not justify our setting aside this finding." (Our italics.)

And in Re Sterba,[4] the court said:

"The facts showing income—amount of debts—the good or bad faith of those who originated the venture, and floated the bond issues—*the probability of solvency through improvement in business conditions—are all to be considered.*" (Our italics.)

In the instant case many elements enter into the determination of feasibility—practicableness, fairness to both debtor and creditor, possibility of appreciation of value and of depreciation, rise in rentals because of better times or scarcity of apartments, possibility of supplementing resources from outside income, ability to meet interest rate, comparison of size of debt with value of security; and we cannot substitute our judgment of the relative values of the foregoing elements for that of the District Court. We believe the evidence justifies the following observations:

(1) The stipulated *cash market value* of the property was $27,000, but the cash market value, while being the readily realizable value, is probably not the true value in a time of stress such as has existed. Debtor and her husband paid $82,000 in cash and trades. They therefore have a real interest to protect, and the price they paid should have some bearing upon the conclusion as to value.

(2) The extension is for a short time—two years—and during that entire time the District Court retains jurisdiction of the debtor and the subject matter, and we can presume that if the affairs of this debtor and the building become threatening the Bank can at any time petition the court for different action. In other extensions which we have held unfair the extensions have been for longer terms.

(3) The creditors cannot be prejudiced by this plan unless the property deteriorates below the value of the lien. The interest rate under the extension was not reduced, but half of it was postponed along with the extension of the principal.

(4) According to the referee's findings there will be sufficient income to carry out the plan, and there will remain $900 excess. The parties have stipulated that $420 will be the annual excess, and the creditors contend that we are bound by that stipulation of fact. We are of course impressed by the stipulation of fact, but ex necessitate it is only an approximation, as no one can foretell what the exact or real excess will be. Since there may be vacancies, or the cost of operation may be less or more, it is only a matter, at the present time, of opinion. Creditors complain that there is not sufficient excess to pay interest on the indebtedness and therefore the plan is not feasible. There will be enough to pay the half interest rate provided in the plan, and under the stipulation, sufficient to pay another $1\frac{1}{2}\%$ interest. The Bank had twice theretofore reduced the contract rate of interest from $6\%$ to $4\frac{1}{2}\%$ and then to $4\%$, and took payments in accord therewith, in full payment. If it did this voluntarily, there is some basis for the District Court's determination that the instant extension requiring the present payment of $3\%$ and the postponed payment of $3\%$ (making $6\%$) was a fair disposition of conflicting interests. The creditor Bank predicates its argument that there is not sufficient income to meet interest payments on a calculation of $6\%$ interest on $33,000 (principal plus accrued interest), and not on $27,000 the principal of the mortgage. The evidence nowhere presents the exact figure of presently due interest. The debtor's schedules state interest to be unpaid from April 15, 1934. The amount is not shown. In fact the Bank applied a cash deposit of debtor on the October, 1934, interest installment. The Bank in its objections states that the evidence shows that the Bank applied the interest money on the payment of taxes, but the evidence makes no mention of such fact.

---

4 7 Cir., 74 F.2d 413, 417.

906

It may be that the referee's approximation of net profit ($900) will more nearly match the actual facts, than the stipulated excess ($420), and the debtor therefore will be able to reduce the amount of interest postponed. It may also be that at the termination of the two year extension the debtor (if still unable to pay off the loan, as will probably be the fact) will be able to refinance the debt, at a lower rate of interest, which now seems to prevail.

(5) The chief creditor, the Bank, has in its possession a deed of the property, executed by the debtor and her husband, which deed is held in escrow, to be recorded in case of debtor's default under the plan, which default continues for 60 days. This is an extremely cautious guarantee to the Bank that it cannot lose under the proposed extension, and is a constant threat to debtor that unless her best efforts are put forth she will lose all. The Bank complains that the deed is defective in conveying the husband's interest, but we believe these technical objections are without merit, and that debtor's husband would be estopped to assert any claims to the land whatsoever.

The referee with full knowledge of the facts, and after a careful consideration of the possibilities of the situation, concluded that the plan was feasible. The District Court adopted this conclusion. The facts which are set out in the record, considered with the inferences which the District Court reasonably could draw therefrom, furnish substantial evidence to support such conclusion.

The Order of the District Court is affirmed.