In the Matter of **DELTA FOOD PROCESSING CORPORATION, Debtor.**

No. GBK 7046.

United States District Court,
N. D. Mississippi,
Greenville Division.

June 3, 1970.

Howard Q. Davis, W. Dean Belk, Indianola, Miss., for Delta Food Processing Corporation.

James Robertshaw, Greenville, Miss., for receiver Wade W. Hollowell.

Thomas R. Hartnett, III, Irving, Tex., DeWayne Morris, of Markstein & Morris, Birmingham, Ala., Howard Dyer, III, of Dyer & Dyer, Greenville, Miss., for creditors Winfield Moon, Miller Box, Inc. and Markstein & Morris.

Douglas C. Wynn, J. Wesley Watkins III, Greenville, Miss., for Winthrop Lawrence Corporation.

Joseph E. Wroten, of Wroten, Orlansky & Miller, Greenville, Miss., for Drake Associates, Annapeg, Inc. and FMC.

N. W. Overstreet, Jr., of Overstreet & Kuykendall, Jackson, Miss., for Crown Financial Corporation.

H. M. Ray, U. S. Atty., William M. Dye, Asst. U. S. Atty., Oxford, Miss., for Economic Development Administration and Small Business Administration.

Frank S. Thackston, Jr., of Lake, Tindall & Hunger, Greenville, Miss., for Chisholm-Rider Corporation.

ORMA R. SMITH, District Judge.

## MEMORANDUM OPINION

This Memorandum Opinion will of necessity be short and concise. The urgency of the matter does not permit the Court to render an opinion containing extensive findings of fact and conclusions of law.

If it should become necessary or advisable after the entry of the Order herein for the Court to prepare and render a supplemental opinion embracing additional findings of fact and conclusions of law, the Court reserves the right to do so at the proper time.

■ The only issue before the Court at this time is whether the petition filed herein by petitioning creditors pursuant to 11 U.S.C.A. § 526 has been filed in good faith. Section 546, Title 11 U.S.C.A. provides:

"§ 546. Good faith of petition

Without limiting the generality of the meaning of the term 'good faith', a petition shall be deemed not to be filed in good faith if—

(1) the petitioning creditors have acquired their claims for the purpose of filing the petition; or

(2) adequate relief would be obtainable by a debtor's petition under the provisions of chapter 11 of this title; or

(3) it is unreasonable to expect that a plan of reorganization can be effected; or

(4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding."

The parties have stipulated that of the four grounds aforesaid upon which a determination can be made that a petition is not filed in good faith, the only ground with which we are concerned is

ground three, which is: "it is unreasonable to expect that a plan of reorganization can be effected".

If the Court finds from the evidence in the case sub judice that it is unreasonable to expect that a plan of reorganization can be effected, it is the duty of the Court to deny the petition. Conversely, however, if the Court finds that it is not unreasonable to expect that a plan of reorganization can be effected, it is the Court's duty to approve the petition.

It must be distinctly understood that the Court is not presently passing upon the feasibility of the plan injected into the case by the testimony of W. L. Smith, Jr., speaking on behalf of Smith Pride Foods, Incorporated. The plan proposed by the witness Smith is not at issue in the proceedings at this time. The only thing the Court considers at this time is whether it is unreasonable to expect that a feasible plan of reorganization can be effected. In order to furnish a guideline for the Court, it is well that reference be made to decisions of the Fifth Circuit Court of Appeals and the District Courts within that Circuit.

The Fifth Circuit in R. L. Witters Associates v. Ebsary Gypsum Company, 93 F.2d 746 (5 Cir. 1938), which arose under the predecessor to Chapter X, § 77B of the Bankruptcy Act said:

"Under the rule (established by the cited cases), if it is clear that under no reasonable possibility can the debtor conform to and obtain the benefits of the statute, and that therefore the petition was manifestly filed, if by the debtor, for delay, or if by petitioning creditors, for harassment, the petition may be dismissed before the plan stage is reached, as wanting in the good faith the statute requires. Under that rule, where the good faith of the filing is attacked, before the plan stage has been reached, unless the impossibility of conforming to and obtaining the benefits of the statute clearly appears, the petition should not be dismissed as not filed in good faith. It should be retained, and questions of plan and reorganization worked out in the thorough and complete way the statute provides for later steps in the proceedings." [1]

Judge Frederick J. R. Heebe, of the United States District Court for the Eastern District of Louisiana, New Orleans Division, has published two exhaustive opinions on the subject which now concerns the Court in the case sub judice. In re Plaza Towers, Inc., 1967, 294 F. Supp. 714; In re Southern Land Title Corporation, 1968, 301 F.Supp. 379. While these two cases deal primarily with real property, as suggested by counsel for Winthrop Lawrence Corporation in their brief, the underlying principle or rule of law is the same. In the *Plaza Towers* case Judge Heebe said:

"Chapter X is designed for the benefit of all who have claims against or interest in the debtor. It is a remedial statute whereby both unsecured and secured debt, as well as interested stockholders, may be adjusted, modified, or otherwise dealt with. For purposes of good faith it is not necessary to show that an equity may exist for the stockholders, or even for all classes of creditors. The requirement of good faith is satisfied if there is shown to be some possibility of an equity or value for creditors who are satisfied with the financial rehabilitation provided by Chapter X. Sections 130 and 179 of the Act, 11 U.S.C.A. §§ 530 and 579, clearly indicate that utilization of Chapter X proceedings by an insolvent debtor is both authorized and justified.

If this proceeding is not dismissed now, then at some later stage we will be called upon to review the merits of any plans of reorganization that may be proposed. At that time, we will have to take a searching look at the fairness, equity and feasibility of such plans." [2]

1. 93 F.2d 748, 749.

2. 294 F.Supp. 719.

Judge Heebe said in *Southern Land Title Corporation,* supra, as follows:

"In determining whether the requisite value or equity exists, the emphasis must be on the future and the ability of the corporation to carry on in the future. The present financial straits of the debtor is irrelevant to the extent that it may be modified by reorganization for the very purpose of Chapter X is to modify and adjust the present stranglehold on the debtor in order that it may continue to operate. The present is relevant, however, as is the past, as an indication of what caused the debtor's floundering condition and what may be expected for the future. Unless the court is satisfied that the prospects for the future are so bleak that no chance for reorganization exists, it should not preclude those who petition from the opportunity to attempt reorganization. The petition is not to be dismissed for lack of good faith merely because the petitioners have no equity, as established by the above authorities; the petition is not to be dismissed for lack of good faith merely because the debtor is unable to meet its present obligations as they mature for this is exactly the cause of the need for corporate reorganization; the petition is not to be dismissed for lack of good faith merely because no plan of reorganization can be devised in which all of the creditors and stockholders may participate, as established by the above authorities. In urging their extreme arguments, the opposing creditors have simply chosen to overlook the very nature of corporate reorganization. At this stage, we must only be satisfied that a chance to reorganize the debtor corporation as a viable concern for the future does exist." [3]

In A–Cos Leasing Corporation v. Wheless (5 Cir. 1970), 422 F.2d 522, the District Court's dismissal of the petition for the lack of good faith was upheld by the Circuit Court of Appeals. The District Court dismissed the Chapter X proceeding because it was not filed in good faith based on the ground that the debtor could obtain relief under Chapter XI, 11 U.S.C.A. § 701 et seq. The Court of Appeals did not have before it for consideration lack of good faith because it appeared unreasonable to expect that a plan of reorganization could be effected. The Court, however, used language in its opinion, which is applicable to "good faith" in Chapter X proceedings. The Court said:

"If the proceeding is to affect only the rights of unsecured creditors, it should be in Chapter XI. It is only when the capital structure or the rights of secured creditors or stock interests are to be affected that resort should be had to Chapter X. Also, 'good faith' is not present if it is unreasonable to expect that a plan of reorganization can be effected. The whole scheme of Chapter X indicates that this test should not bar approval of a petition unless it is abundantly clear that there is no possibility that a plan of reorganization can be effected. In other words, the Court should be 'reorganization minded' and not 'liquidation minded.' Any doubt as to whether a plan can be effected should be resolved in favor of the approval of the petition, as some corporations whose affairs have seemed hopeless at the outset have undergone successful reorganization. In other words, the provisions of Chapter X should be given a sympathetic construction consonant with the relief intended. 'PROCEDURAL ASPECTS OF CHAPTER X', Honorable Clive W. Bare, Referee in Bankruptcy, Eastern District of Tennessee; Vol. IV, Proceedings of Fourth Seminar for Referees in Bankruptcy." [4]

 The Court understands from statements made by counsel for Winthrop Lawrence, the creditor holding the first lien on Delta's inventory, that it will not vote for any plan to reorganize the cor-

---

3. 301 F.Supp. 411.

4. 422 F.2d 524, 525.

poration. If it is absolutely necessary to have the consent of this creditor before a plan can be accepted, of course this statement by the secured creditor would terminate the proceedings. However, the opposition of Winthrop Lawrence cannot defeat a plan to reorganize the corporation if such is submitted to and approved by the Court at a later time in the proceedings. The Circuit Court of Appeals for the Fifth Circuit held in York v. Florida Southern Corporation et al. (5 Cir. 1962) 310 F.2d 109, p. 110 as follows:

> "We do not believe that the fact, standing alone, that a class of secured creditors announces in advance that it will not agree to a reorganization plan makes it impossible for a Chapter X reorganization petition to be filed in 'good faith'." [5]

 The cases hereinbefore cited lead the Court to the conclusion that "unless it is abundantly clear that there is no possibility that a plan of reorganization can be effected", [6] the duty of the Court is to approve the petition. It is also clear from the above mentioned authorities that "any doubt as to whether a plan can be effected should be resolved in favor of the approval of the petition". [7]

Delta Food Processing Corporation (Delta), the debtor, was organized under the laws of the State of Mississippi and a charter of incorporation was issued to it on April 18, 1966. The original charter provided for the issuance of 200 shares of common capital stock having a par value of $25.00 each, or an aggregate amount of common capital stock in the sum of $5,000.00. The charter was amended on several different occasions until on January 24, 1968 the authorized capital stock was increased to 80,000 shares of common capital stock of the value of $25.00 each, or an aggregate amount of $2,000,000.00. At that time

the charter authorized the issuance of 875,000 of 5% of noncumulative preferred stock, each share to have a par value of $2.00, or a total of $1,750,000.00 of preferred stock.

On or about June 3, 1966, Delta, through its attorney, made an application for commercial or industrial loan to the Economic Development Administration, United States Department of Commerce. Delta's principal products or services, as authorized by its charter were shown on the application to be, "Canned and fresh frozen vegetables, including green beans, southern peas, field peas, okra, leafy greens (turnip, collard and mustard), squash, carrots, broccoli, sweet and white potatoes, and the like". The cost of the project as listed on the application is shown to be $5,162,252.00. The proposed financing included a proposed loan from EDA in the sum of $3,355,464.00, a bank loan from First National Bank, Jackson, Mississippi in the sum of $1,200,000.00 stockholders' contribution $596,038.00, and public funds donated $10,750.00. This aggregated the sum of $5,162,252.00. The application showed working capital to be borrowed funds, $713,962.00, and loans $5,000,000.-00, or a total of $5,713,962.00. The application was supported by an economic brief prepared by Delta's attorney, for submission to EDA. The brief favorably supports the application for the loan and concludes with a statement as to the economic feasibility of the project as follows: "Finally, we believe that all of the studies that have, or could be made, can come only to the conclusion that a vegetable canning and freezing plant located centrally with regard to both its raw materials and the markets which it can economically serve overnight from its plant site". The survey concluded, "In conclusion, we believe that the application should be granted so that this very worthwhile project can proceed".

5. 310 F.2d 110.

6. A-Cos Leasing Corporation v. Wheless, 422 F.2d 522, 525.

7. Id.

The history and nature of the business is succinctly stated in the Report On Financial Statement And Business (Unaudited), dated April 10, 1970, prepared by Price Waterhouse & Co., which is as follows:

"Delta Food Processing Corporation (Delta Food) was organized on April 18, 1966 to operate a vegetable canning and freezing plant at Moorehead, Mississippi. On December 23, 1967 Mr. Winfield Moon purchased ownership of Delta Food from Walcott & Steele, Inc.

The financing for the plant construction consisted mainly of a $1,200,-000 first mortgage loan from Crown Financial Corporation (Crown), a $3,325.781 second mortgage loan from the Economic Development Administration (EDA) of the U.S. Department of Commerce and capital contributed by Mr. Winfield Moon.

Although the plant was not complete, the company began processing in June 1969 and continued operating at partial capacity until early December 1969, at which time working capital obtained through loans from Mr. Winfield Moon, Mr. Jimmy Hinton and Winthrop Lawrence Corporation was exhausted. At the present time, the only operations at the plant are those necessary to maintain the frozen food locker and to prepare goods for shipment."

There has been introduced in evidence a report on the financial condition of Delta as of July 14, 1969, made by the company's regular accountant. The evidence shows that Delta did not maintain a regular and complete set of books from which the audit could be made, and the accountant was required to prepare the report from cancelled checks, deposit slips, invoices, and such other records as he could locate while preparing the audit.

The balance sheet in this report reflects current assets of $507,621.80, land, plant and equipment $5,773,637.69, other assets $7.50, or total assets $6,281,266.99. The liabilities and stockholders' equity side of the ledger shows current liabilities $854,467.97, other liabilities $4,094,805.63, or total liabilities $4,949,273.60. Stockholders' equity is shown to be $1,331,993.39. Total liabilities and stockholders' equity $6,281,-266.99.

The statement of earnings and retained earnings included in this report, covering the period starting with April 15, 1969, the date upon which Delta started doing business, and ending July 14, 1969, shows a net loss for the period of $94,080.61.

One of the petitioning creditors herein, Winfield Moon, purchased the outstanding stock of Delta from Walcott & Steele, Inc., former owners, on December 23, 1967. As has been hereinbefore mentioned, Delta was financed mainly by loans from Crown Finance Corp. (Crown) and Economic Development Administration (EDA) of the United States Department of Commerce, and capital contributed by Moon. The plant of Delta was operated from June 1969 to December 1969 mainly through working capital supplied by Moon, and loans through Jimmy Hinton and Winthrop Lawrence Corp. These funds were exhausted in December 1969, and since that time the only operations by Delta have been those necessary to maintain the frozen food locker and to prepare goods for shipment.

On February 10, 1970, Crown, holding the voting rights of 80 per cent of the common stock of Delta, which had been pledged to it by Moon to secure Moon's personal note to Crown assumed control of Delta through election of a new board of directors. After taking over the management of the company, Crown caused a special audit of its affairs to be made by Price Waterhouse & Co. The object of the audit was to determine the net worth of the business, and did not include a study of the earnings of the company.

After an extended audit, which included the verification of inventories, ac-

counts receivable, and obligations of the company Price Waterhouse & Co. made its report to the management of Delta.

This report made as of February 28, 1970, reflects an unaudited balance sheet as follows:

## "DELTA FOOD PROCESSING CORPORATION

### Balance Sheet

### (Unaudited)

### February 28, 1970

### Assets

| | | |
|---|---:|---:|
| Current assets | | |
| Cash | | $ 20,218 |
| Accounts receivable – | | |
| Winfield Moon | $222,168 | |
| Less reserve for doubtful accounts | (222,168) | – |
| Trade and other | 79,911 | |
| Less reserve for doubtful accounts | (6,000) | 73,911 |
| Inventories – | | |
| Food products | 710,484 | |
| Supplies | 38,734 | 749,218 |
| Prepaid expenses | | 33,050 |
| Total current assets | | 876,397 |
| Property, plant and equipment, at cost (Exhibit II) | | |
| Land | | 75,000 |
| Land improvements | | 184,450 |
| Building and building facilities | | 3,024,076 |
| Machinery, equipment and office furniture | | 2,184,221 |
| | | 5,467,747 |
| Less accumulated depreciation | | 140,000 |
| | | 5,327,747 |
| Deposits | | 1,007 |
| | | $6,205,151 |

### Liabilities and Stockholders' Deficit

| | |
|---|---:|
| Current liabilities | |
| Current portion of long-term debt | $1,279,545 |
| Trade accounts payable | 508,370 |
| Leases payable | 331,860 |
| Accrued interest payable | 224,943 |
| Other accrued liabilities | 56,293 |
| Total current liabilities | $2,401,011 |
| Long-term debt, less current portion | 4,179,082 |
| Total liabilities (Exhibit III) | 6,580,093 |

Stockholders' deficit

| | | |
|---|---|---|
| 5% non-cumulative preferred stock, $2 par value, 875,000 shares authorized, 400,537 shares issued and outstanding | $801,074 | |
| Add collected subscriptions not yet issued (3,343 shares) | 6,686 | 807,760 |
| Common stock, $25 par value, 80,000 shares authorized; 25,000 shares issued and outstanding | | 625,000 |
| Accumulated deficit | | (1,807,702) |
| | | (374,942) |
| Contingent liabilities | | $6,205,151" |

———◆———

Included on the asset side of the balance sheet is an indebtedness due to the company by Moon in the sum of $222,168.00, against which a reserve of the same sum is charged, thus, in effect charging off the account as worthless. The liability side of the ledger reflects an indebtedness of the company to Moon of $268,750.00. The asset side also carries inventory at the sum of $749,218.00. The evidence shows that the actual value of the inventory, as determined by the auditing firm was $998,958.00. The auditors were directed by management to reduce the value of the inventory, as the company was not then a going concern, by 25% or $249,740.00. Should the Moon receivable of $222,168.00, and the deduction in value of the inventory of $249,740.00 be added to assets, the balance sheet would show total assets of $6,677,059.00. This amount would exceed total liabilities of $6,580,093.00 by $96,966.00.

Without reviewing in detail the evidence in the case suffice it to say that it is clear to the Court that Delta has not had an opportunity to demonstrate that it can engage in a successful and profitable operation. Delta has never had an adequate operating fund with which to launch its business. While the plant is not one hundred per cent completed, it is functional and can be operated near capacity.

The evidence shows that with adequate financing available Delta has the potential of developing into a profitable operation, which will be a great asset to the community it serves.

The successful operation of Delta will furnish an outlet for vegetable crops grown by producers in the territory served by Delta, and employment opportunities for residents of the community.

The Court is convinced from the evidence introduced in the case that it is not unreasonable to expect that a plan of reorganization can be effected, which will benefit all persons who have a financial interest in Delta, as well as in the community as a whole.

The evidence shows that Crown, under whose control Delta is now being operated, desires that Delta institute voluntary bankruptcy proceedings. This move is supported by EDA and Winthrop Lawrence. Crown holds a first lien on the land and a large portion of the equipment owned by Delta, to secure a loan of $1,127,957.00, exclusive of interest. EDA holds a second mortgage on the property securing a loan, upon which there is a balance due of $3,116,704.00, exclusive of interest. Winthrop Lawrence holds a paramount lien of $338,-000.00, for the payment of which Delta has pledged its inventory of the value of $998,958.00 (value of inventory as determined by the auditors), as well as certain receivables. Jimmy Hinton has

a lien on the inventory, second to that held by Winthrop Lawrence, to secure a debt of $550,000.00. Crown, EDA and Winthrop oppose the Chapter X proceedings herein, and support the bankruptcy move. The Court is of the opinion, in the event of straight bankruptcy, that Crown and Winthrop Lawrence will realize their claims in full. EDA will probably realize all of its investment. Jimmy Hinton, however, will stand to lose some of his claim, and all unsecured creditors and stockholders will lose their claims entirely. This, in the Court's opinion, would be the result of straight bankruptcy.

If an acceptable plan of reorganization can be developed, Crown, EDA and Winthrop Lawrence will not be materially prejudiced, and all other creditors as well as stockholders will have a chance to recover their claims and investments.

The Court finds that justice, fair dealing and equity, require that the petitioning creditors be accorded the opportunity of rehabilitating this corporation, and that it does not appear that it is unreasonable to expect that such can be accomplished.

Accordingly, an appropriate order finding that the complaint is in due form and has been filed in good faith will be entered; a trustee will be appointed; and such other action taken as is appropriate.