In re VICTORY CONSTRUCTION CO., INC., Debtor.

Bankruptcy No. LA–80–07936–RO.
Adversary No. 80–2131–RO.

United States Bankruptcy Court,
C. D. California.

Jan. 26, 1981.

Gilbert Robinson & Gary E. Klausner of Robinson, Wolas & Diamant, Los Angeles, Cal., for debtor.

William C. Moritz of Donnelly, Clark & Chase, Los Angeles, Cal., for plaintiff John H. Hadley.

Mason Brown of Brown & Brown, P. C., Los Angeles, Cal., for plaintiff Fred B. Green.

MEMORANDUM OPINION ON COMPLAINT TO VACATE STAY FOR CAUSE (LACK OF GOOD FAITH OF THE DEBTOR IN FILING ITS PETITION UNDER CHAPTER 11)

ROBERT L. ORDIN, Bankruptcy Judge.

1. *Introduction*

On August 11, 1980, Victory Construction Co., Inc., a California corporation (hereinafter "Victory") filed a petition under Chapter 11. The debtor's sole asset is a parcel of improved real property known as 8511 Beverly Place, Los Angeles, California (hereinafter called the "real property"). It is subject to the following liens of record:

| | |
|---|---:|
| A first trust deed in favor of California Federal Savings and Loan, securing an unpaid obligation of $221,338.36, including principal and interest .... | $221,338.36 |
| A second trust deed in favor of Japan California Bank, securing an unpaid obligation of $346,639.07, including principal and interest (plus attorneys' fees disputed in amount but which the bank claims in the sum of $50,000) ........... | 346,639.07 |
| A third trust deed in favor of John Hadley and others, securing an unpaid obligation of $1,354,056.24, including principal and interest (plus attorneys' fees disputed in amount, but which Hadley claims in the sum of $80,000) ........... | 1,354,056.04 |
| A fourth trust deed in favor of Japan California Bank, securing an unpaid obligation of $346,639.07, including principal and interest (plus attorneys' fees) ............... | 346,639.07 |
| A lien for taxes due the County of Los Angeles in the approximate sum of $30,000 ........ | 30,000.00 |
| A mechanic's lien securing an unpaid obligation to Green of $576,714.74, including principal and interest .............. | 576,714.74 |
| A mechanic's lien to Decorative Carpets, securing an unpaid balance of $23,891.23, including principal and interest .... | 23,891.23 |
| Total liens ....... | $2,899,278.71 |

On August 20, 1980, nine days after the debtor filed its petition, Japan California Bank, Hadley, Green, and Decorative Carpets filed a complaint seeking:

(i) Relief from the automatic stay against lien enforcement; or

(ii) Dismissal of the debtor's petition as not having been filed in good faith.

The trial of these issues began on October 20, 1980.[1] Immediately prior to the commencement of the trial, Japan California Bank (hereinafter "JCB") entered into a stipulation with the debtor permitting entry of a judgment vacating the stay against JCB, on condition that JCB would not execute on the judgment so long as payments were made in accordance with an agreement referred to in the stipulation, and on the further condition that no other creditor with a lien on the property was granted leave to foreclose.[2] The foregoing stipulation and judgment were approved by the court on October 20, 1980, before trial commenced, whereupon JCB withdrew its request for relief and did not participate further in the litigation. The trial of the remaining issues was joined between the plaintiffs Hadley, Green, and Decorative Carpets (hereinafter "plaintiffs"), and the debtor-defendant (hereinafter "Victory").

## 2. *The issues to be determined*

Plaintiffs seek an order vacating the automatic stay and permitting foreclosure of their defaulted liens, *for cause.* They assert as "cause": (a) that Victory did not file its Chapter 11 petition in "good faith"; (b) that plaintiffs have neither received nor been offered "adequate protection" of their interest in the property;[3] and (c) that Victory has no equity in the real property, and the property is not necessary to an effective reorganization. In addition, plaintiffs assert that the debtor's lack of good faith in filing the petition requires the court to dismiss the Chapter 11 case in its entirety.

## 3. *The "good faith" issue*

The "good faith" issue may be analyzed as follows:

(1) Does a debtor's lack of "good faith" in filing a Chapter 11 case constitute "cause" to vacate the automatic stay under § 362(d)(1)?

(2) Does the law impose a "good faith" condition on debtor's right to file or maintain a proceeding under Chapter 11?

If the answer to these questions is negative, plaintiff's right to relief in this case is limited to a consideration of the issues of adequate protection, the existence of equity, and whether the property is necessary to an effective reorganization.

(3) Was the debtor's petition in this case filed in "good faith"?

"Good faith" as a standard of confirmation in debtor rehabilitation or reorganization proceedings, or as a condition to the debtor's right to file and maintain proceedings aimed at rehabilitation or reorganization, has appeared in many provisions of the Bankruptcy Act of 1898; and the courts have explored the meaning of the term in a wide variety of fact situations and circumstances. While many of the cases merely use the term or refer to "good faith" provisions of the statutes without contributing to an understanding of its meaning, a large number of cases attempt and make a meaningful analysis and contribute to an understanding of the concept. Some of these cases are collected in the Appendix to this opinion.

As the cases disclose, however, judicial analysis of the meaning, scope, and dimension of "good faith" in rehabilitation or reorganization cases has not differentiated between the "good faith" required to confirm a plan of arrangement, and the "good faith" required at the outset as a condition of the right to file and maintain the pro-

---

**1.** The trial date was fixed by stipulation of the parties.

**2.** This stipulation was based on an agreement between JCB and interests herein referred to as "Ashkenazy," whereby: (i) the note involved in JCB's fourth lien was purchased outright by Ashkenazy; and (ii) Ashkenazy assumed the obligation to pay the JCB note secured by the second lien on the property and agreed to make the payments of principal plus 12% interest, as

follows: (a) payments of interest only in the sum of $3,072.11 each month, commencing January 1, 1981 and continuing until December 1, 1983; and (b) payment of the entire principal balance of $307,211.20 on or before December 31, 1983.

**3.** The evidence does not disclose any effort by the debtor to provide plaintiffs with adequate protection.

ceeding. Moreover, an understanding of the cases requires some knowledge of the provisions of the statutes to which they refer and an appreciation of the purposes and philosophies embodied in these laws.

Accordingly, a cursory examination of the provisions and purposes of these statutes will be useful.

### (i) Section 12 (1898)

This section permitted a bankrupt to offer terms of composition to creditors, and authorized the court to confirm the proposal upon stated conditions. The effect of this composition was to supercede the bankruptcy proceedings and revest the bankrupt with all his property, free of the claims of creditors. *Rider*, 96 Fed. 808 (N.D.N.Y. 1899). It was the duty of the judge, upon request for confirmation, to confirm if the standards set forth in the section were complied with. *Weintrob*, 240 Fed. 532 (E.D.N. C.1917); *Adler v. Jones*, 109 Fed. 967 (6th Cir. 1901); *McLellan*, 204 Fed. 482 (N.D.N. Y.1913). No offer of composition could be confirmed by the court, however, unless

> (3) the offer and its acceptance are in good faith, and have not been made or procured except as herein provided, or by any means, promises, or acts herein forbidden. [Section 12(d)(3)]

This "good faith" requirement was a condition of confirmation. It was not expressed as a condition of the right to initiate the bankruptcy proceeding.

### (ii) Section 74 (1933)

This section permitted individuals, not corporations, to seek a composition or extension with creditors. Upon the filing of the petition, the judge was required to approve the petition if satisfied that it was filed in "good faith," and if not, to dismiss it. [Section 74(a)] The court was authorized to confirm the proposal, if satisfied, among other things, that:

> (4) The offer and its acceptance are in good faith, and have not been made or procured except as herein provided, or by any means, promises or acts herein forbidden. [74(g)(4)]

"Good faith" was required as a condition to filing, and was required in order to confirm a proposed composition or extension.

Section 74 was intended to provide relief to persons who, finding themselves embarrassed by debts accumulated in the past, desired the opportunity to submit terms of compromise to their creditors. *In re Cosgrave*, 10 F.Supp. 672 (Calif.1935). The section did not contemplate immediate liquidation but a postponement, with the hope of ultimate payment and rehabilitation. It was the intent of Congress to open the door to distressed debtors who could exhibit some reasonable expectation of paying their debts if given an extension of time. *Van Doren*, 79 F.2d 859 (7th Cir. 1935). The section contemplated a feasible plan promptly presented whereby the overburdened debtor could, through creditor cooperation, secure a scaling of debt or extension of the due date of the debts. *Sterba*, 74 F.2d 413 (7th Cir. 1935).

### (iii) Section 75 (1933)

Subsections (a)–(r) permitted a farmer to effect a composition or extension of time to pay accumulated debts. The proposal could be confirmed if the court was satisfied that:

> (3) The offer and its acceptance are in good faith and have not been made or procured except as herein provided, or by any means, promises, or acts herein forbidden. [Section 75(i)(3)]

If the farmer failed to obtain the necessary acceptances or otherwise contended that the composition or extension aggrieved him, he could voluntarily elect to be adjudicated a bankrupt, and obtain the benefits of a three-year moratorium against debt collection and lien enforcement upon the terms and conditions provided in the statute. [Section 75(s)] As in Section 12, Section 75(a)–(r) did not impose a "good faith" condition to initiating the proceeding. There was no reference to "good faith" in Section 75(s).

The plain purpose of Section 75 was to afford relief to farmers who found themselves in economic distress, however severe,

by giving them a chance to seek an agreement with their creditors [sections (a)–(r)], and failing this, to ask for the other relief afforded by subsection (s). *John Hancock Ins. Co. v. Bartels*, 308 U.S. 180 at 185–187, 60 S.Ct. 221 at 223–224, 84 L.Ed. 176 (1939). The scheme of the statute was to provide an orderly procedure to give whatever relief could properly be afforded to the distressed farmer-debtor, while protecting the interests of creditors by assuring fair application of the debtor's property to the payment of claims, while priorities and liens of secured creditors were preserved.

### (iv) *Section 77* (Railroad reorganizations) (1933)

When a petition was filed under this section, the court was required to approve it, "if satisfied that such petition complies with this section and has been filed in good faith," or to dismiss it if not so satisfied. [Section 77(a)] A plan of reorganization could be approved if the court was satisfied that:

> the offer of the plan and its acceptance are in good faith and have not been made or procured by any means or promises forbidden by the Act. [Section 77(g)(3)]

Section 77 was similar to Section 74, in that it expressly required "good faith" as a condition to the filing of the proceeding, and again, as a condition to confirmation.

### (v) *Section 77B* (1934)

This section authorized the reorganization of corporations within its scope. When a petition was filed, the judge was authorized to approve it if the petition was filed in "good faith." [Section 77B(a)] A plan of arrangement could be confirmed if the judge was satisfied that:

> (6) The offer of the plan and its acceptance are in good faith and have not been made or procured by any means or promises forbidden by this Act.

[Section 77B(f)(6)]

The essential purpose of Section 77B was to preserve and continue a going business [*Dutch Woodcraft Shops*, 14 F.Supp. 467 (Mich.1935)], and to provide mechanics for

reorganization where reasonable expectation of continued useful existence could be fairly entertained. *Tenn. Pub. Co.*, 81 F.2d 463 (1936 6th Cir.); *Provident Mut. Life Ins. Co. v. University Ev. L. Church*, 90 F.2d 992 (9th Cir. 1937). Section 77B was intended to avoid the consequences to debtors and creditors of foreclosures, liquidations, and forced sales, with their drastic deflationary effects. *Case v. L.A. Lumber Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

### (vi) *Chapter IX* (1934)

This provision authorized a municipality and certain other political subdivisions to file a petition to effect readjustment of debts. The judge was authorized to approve the petition as properly filed "if satisfied that such petition complies with this chapter and has been filed in good faith." [Section 80(a)]

### (vii) *Chapter X* (1938)

This chapter dealt with the reorganization of corporate debtors. Upon the filing of the petition, the judge was required to "enter an order approving the petition, if satisfied that it complied with the requirements of this chapter and has been filed in good faith," or to dismiss it. [Sections 141 through 144]. Unlike the previous rehabilitation or reorganization provisions of the law, it contained a partial definition of "good faith," and provided that a petition was deemed not to be filed in "good faith" if (1) the petitioning creditors acquired their claims for the purpose of filing the petition; or (2) adequate relief was obtainable by a debtor's petition under the provisions of Chapter XI of this Act; or (3) it was unreasonable to expect that a plan of reorganization could be effected; or (4) a prior proceeding was pending in any court and it appeared that the interests of creditors and stockholders would be best subserved in such prior proceeding. However, the generality of the meaning of the term "good faith" in Chapter X, was not intended by the statute to be limited by the four negative tests found in Section 146 (1) through (4). *Julius Roehrs Co.*, 115 F.2d

723 (3d Cir. 1940); *In re Marine Harbor Properties*, 125 F.2d 296 (2d Cir. 1942); *In re Lela & Co., Inc.*, 551 F.2d 399 (D.C.Cir. 1977); *Southern Land Title Corp.*, 301 F.Supp. 379 (E.D.La.1969); *Metropolitan Realty Corp.*, 433 F.2d 676 (5th Cir. 1970).

The judge was authorized to confirm the plan of arrangement if:

(3) The proposal of the plan and its acceptance are in good faith and have not been made or procured by any means or promises forbidden by this Act. [Section 221]

Chapter X made "good faith" a condition to initiating the proceeding, and to confirmation.

Congressional purpose in enacting the statute was to encourage resort to bankruptcy reorganization as a means of avoiding unnecessary or premature liquidation [*Breeding Motor Fr. Lines v. Reconstruction Finance Corp.*, 172 F.2d 416 (10th Cir. 1949)], to relieve distressed corporations and to provide the mechanics for reorganization [*In re Southwestern Enterprises, Inc.*, 261 F.Supp. 721 (W.D.Ark.1966)], and to permit the debtor to restructure the debts and pay creditors while retaining its property [*SEC v. U.S. Realty*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *SEC v. American Trailer Rentals*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1964)]. These objectives were summarized by the Supreme Court as follows: (i) to avoid immediate liquidation of the property involved, with a view to rehabilitation rather than liquidation; (ii) to afford a respite so that owners and creditors might have time to recapitalize or refinance and preserve intangible values usually associated with the assets of a going business; and (iii) to afford the bondholders an opportunity to avoid liquidation through foreclosure. *Continental Ill. Nat. Bank & Trust Co. v. Chicago Rock Island, et al.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; *SEC v. U.S. Realty Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293.

### (viii) *Chapter XI* (1938)

Under this chapter, a debtor was authorized to file a petition seeking an arrangement with creditors. The court was authorized to confirm the arrangement if satisfied that:

(5) The proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act. [Sections 361 and 366]

There was no reference in Chapter XI to "good faith" of the debtor in filing the proceeding.

Chapter XI, like Chapter X, was designed as a vehicle for financial rehabilitation. *SEC v. American Trailer Rentals*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1964).

### (ix) *Chapter XII* (1938)

This chapter also authorized a petition seeking an arrangement with creditors. The arrangement could be confirmed if the court was satisfied that:

(4) The proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act. [Sections 467, 472]

There was no reference in Chapter XII to the "good faith" of the debtor in filing the proceeding.

Like Chapter XI, Chapter XII favored arrangement rather than liquidation, and was intended for use by insolvent debtors. *Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C.Mass.1977).

### (x) *Chapter XIII* (1938)

This chapter authorized the debtor to file a petition to effect a composition or extension, or both, with creditors. The court was authorized to confirm the plan or arrangement if:

(4) the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act.

Like Chapters XI and XII, Chapter XIII did not expressly make "good faith" a condition of the right to file or maintain the proceeding.

**(xi)** *Title 11*

While "good faith" is made a condition to the confirmation of a plan under Chapter 11 and Chapter 13, Title 11 does not contain a provision expressly conditioning the right to file or maintain a proceeding on the "good faith" of the debtor at the time the proceeding is initiated.

The "good faith" confirmation standard is expressed as follows:

The plan has been proposed in good faith and not by any means forbidden by law. [Section 1129(a)(3) and 1325(a)(3)].

Review of these statutory provisions discloses that: (i) Sections 74, 77, 77B, Chapter IX, and Chapter X each contained an express "good faith" filing requirement;[4] Section 75, Chapters XI, XII, XIII of the Act, and Chapters 11 and 13 of the Code do not; and (ii) prior to Chapters XI, XII, and XIII, and the Code, Section 75 was the *only* reorganization or rehabilitation section which did not contain a "good faith" filing requirement.[5]

As the term "good faith" continued to appear in these rehabilitation and reorganization statutes, the case law was developing and imparting dimension and scope to the term. The issue was often raised early in the proceeding by secured creditors who asserted (i) that the filing was an attempt to delay foreclosure despite the lack of any rational basis to believe that a composition or extension was possible,[6] and (ii) that the proceeding was a sham, or device to deprive the secured creditor of rightful recourse to its collateral.[7] These objections were voiced as a "lack of good faith" in initiating the proceeding. Early cases under Section 12 noted that the provisions for composition or extension were clearly at variance with the common law, and must be strictly construed.[8] When the economic realities of the debtor were so bleak that no fair compromise or extension was possible, the courts easily determined that the debtor's purpose was delay and harassment of creditors, and was an abuse of the legislative intent. This was expressed as a "lack of good faith."[9]

The courts quickly recognized "good faith" as an effective means to prevent abuse or distortion of reorganization or rehabilitative provisions of the bankruptcy law. The first such statute, Section 12, was not permitted to be used to accomplish an inequitous or unfair result,[10] or to obtain a

---

**4.** Bankruptcy Act Sections 74(a), 77(a), 77B(a), 80(a), and 141–144.

**5.** The Supreme Court explained this omission in *Bartels*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736: Section 75 was emergency legislation enacted to deal with the plight of the farmer as a result of the Great Depression. The farmer's situation could not be measured by standards applicable to other debtors. Generally, there was no reasonable potential for rehabilitation in the accepted sense. The moratorium was to give the farmer time to recover, and was not dependent on whether or not he could propose a plan which was economically feasible at the outset. "Good faith" as a condition to the right to file would require that rehabilitation be within the farmer's grasp. The imposition of such a condition would have nullified the purpose of the legislation. [See *Bartels*, p. 185, 60 S.Ct. p. 223]

**6.** *Paul*, 13 F.Supp. 645 (C.D.Iowa 1936); *Noble*, 19 F.Supp. 504 (D.N.J.1937); *Lemm v. Northern Cal. Nat'l. Bank*, 93 F.2d 709 (9th Cir. 1937); *White v. Pennelas Mining Co.*, 105 F.2d 726 (9th Cir. 1939); *R. L. Witters Assocs. v. Ebsary Gypsum Co.*, 93 F.2d 746 (5th Cir.

1938); *Price v. Spokane Silver & Lead Co.*, 97 F.2d 237 (8th Cir. 1938); *Southern Land Title Corp.*, 301 F.Supp. 379 (E.D.La.1969).

**7.** *Henderson*, 100 F.2d 820 (5th Cir. 1938); *John Hancock Life Ins. Co. v. Bartels*, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939); *Dutch Woodcraft Shops*, 14 F.Supp. 467 (Mich.1939).

**8.** *Frear*, 120 Fed. 978 (N.D.N.Y.1903); *Rider*, 96 Fed. 808 (N.D.N.Y.1899).

**9.** *Goodman v. Michael*, 280 F.2d 106 (1st Cir. 1960); *REA Holding Corp. v. Manning*, 558 F.2d 1127 (2d Cir. 1977); *Fidelity Assurance Ass'n. v. Sims*, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943); *Hickey v. Ritz-Carlton Restaurant & Hotel Co.*, 96 F.2d 748 (3rd Cir. 1938); *Tenn. Publishing Co.*, 81 F.2d 463 (6th Cir. 1936); *Provident Mut. Life Ins. Co. v. University Ev. L. Church*, 90 F.2d 992 (9th Cir. 1937); *First Nat'l. Bank v. Conway Road Estates Co.*, 94 F.2d 736 (8th Cir. 1938).

**10.** *Rider*, 96 Fed. 808 (N.D.N.Y.1899); *Frear*, 120 Fed. 978 (N.D.N.Y.1903).

result contrary to the spirit to the statute,[11] or by the debtor who concealed assets or financial condition,[12] or where there was an unexplained shrinkage of assets.[13]

The courts were equally vigilant to prevent misuse of the broader rehabilitation provisions of Section 74. The section could not be used to accomplish prolonged delay[14] or in aid of speculative ventures.[15] It was the duty of the court to see that the law was not abused in practice[16] and a petition was not filed in good faith if the statutory objectives of rehabilitation could not be accomplished,[17] or the entire transaction was a protective cover for fraudulent design.[18] Willful failure to comply with the statute precluded access to the rehabilitation court,[19] as did any deliberate attempt to mislead the court.[20] Even the farmer, for whose benefit special protective legislation was designed, was not permitted to use the statute for a purpose not intended by Congress,[21] or take advantage of the Act for an ulterior purpose,[22] or to accomplish delay while waiting for an upturn in the market,[23] or to defraud a wife,[24] or to permit milking of the assets.[25] Moreover, the farmer was required to approach the proceeding with candor, frankness, sincerity, willingness to perform, and a mere perfunctory compliance with the letter of the law was not sufficient.[26] Secret advantages to favored creditors or other improper or fraudulent purpose justified denial of access to the rehabilitative provisions of Section 75.[27]

The "good faith" of the corporate debtor seeking to utilize the provisions of Section 77B was measured by similar standards. The debtors that secreted assets,[28] or used the statute merely in an attempt to unreasonably deter and harass creditors in *bona fide* efforts to realize upon their collateral,[29] or as a basis to propound visionary or unpractical schemes for financial resuscitation,[30] or under circumstances where no reasonable possibility existed that the debtor could conform to or obtain the benefits of the statute,[31] or as a means to escape the day of reckoning for proven acts of misconduct,[32] or to solve disputes between equity owners,[33] or for whom there was no reasonable prospect for continued useful existence and the only possible expedient was imme-

11. *Cockshaw*, 220 Fed. 239 (S.D.N.Y.1915).

12. *In re Barde*, 207 Fed. 654 (D.Or.1913).

13. *Weintrob*, 240 Fed. 532 (E.D.N.C.1917); *Riley v. Pope*, 186 Fed. 857 (S.D.Ga.1911).

14. *Wilson v. Alliance Life Ins. Co.*, 102 F.2d 365 (5th Cir. 1939).

15. *Cosgrave*, 10 F.Supp. 672 (C.D.Cal.1935).

16. *Cosgrave, supra.*

17. *Sterba*, 74 F.2d 413 (7th Cir. 1935).

18. *Collins*, 75 F.2d 63 (8th Cir. 1934); *Shapiro v. Wilgus*, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355.

19. *Tinkoff*, 85 F.2d 305 (7th Cir. 1936).

20. *Sieben*, 89 F.2d 935 (7th Cir. 1937).

21. *Fullagar*, 8 F.Supp. 602 (N.Y.1934).

22. *Paul*, 13 F.Supp. 645 (C.D.Iowa 1936).

23. *Noble*, 19 F.Supp. 504 (D.N.J.1937); *Brewster*, 20 F.Supp. 789 (W.D.La.1937); *Cresap*, 99 F.2d 722 (7th Cir. 1938).

24. *Brown*, 21 F.Supp. 935 (Iowa 1938).

25. *Olsen*, 21 F.Supp. 504 (Iowa 1937).

26. *Vater*, 14 F.Supp. 631 (E.D.Ky.1936).

27. *John Hancock Life Ins. Co. v. Bartels*, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939).

28. *Wisun & Golub, Inc.*, 84 F.2d 1 (2d Cir. 1936).

29. *Loeb Apartments*, 89 F.2d 461 (7th Cir. 1937).

30. *O'Conner v. Mills*, 90 F.2d 665 (8th Cir. 1937).

31. *New York Title & Mortgage Co.*, 9 F.Supp. 319 (N.D.N.Y.1939); *R. L. Witters Assoc. v. Ebsary Gypsum Co.*, 93 F.2d 746 (5th Cir. 1938); *Price v. Spokane Silver & Lead Co.*, 97 F.2d 237 (8th Cir. 1938).

32. *In re Cook*, 104 F.2d 981 (7th Cir. 1939).

33. *Piccadilly Realty Co.*, 78 F.2d 257 (7th Cir. 1935).

diate liquidation,[34] or whose sole hope of financial salvation is an abiding faith in miracles,[35] were all rejected by the reorganization court for lack of "good faith."

The zeal with which the courts used the "good faith" filing requirement to prevent abuse of the statute led to a reading of Section 75, which inserted a "good faith" filing requirement not contained in the statute.[36] Creditors attacked the farmer's Section 75 petition because the economics of the situation held little or no hope of achieving an extension or composition, and demanded that it be dismissed for lack of "good faith." The theory of the attack was that no confirmation could be had without a finding that the proposal was in "good faith," and the hopelessness of the farmer's financial condition made any meaningful proposal impossible; *therefore*, the petition itself was a sham, a mere device to delay and harass creditors, and was not in "good faith." [37]

These attacks were often successful. The case law became so extensive and this view so pervasive that the Supreme Court, in *Vinton Branch* (Justice Brandeis), referred to the "requirement of good faith in the initiation of proceedings under Section 75." (The famous footnote 6 (300 U.S. 440, at 462, 57 S.Ct. 556, at 561, 81 L.Ed. 736). Three years later, in *Bartels*, the Supreme Court noted the error and pointed out that the only reference to "good faith" in Section 75 is in the provision of the statute relating to confirmation of the farmer's proposal.[38]

When Chapter X was adopted, the concepts and principles derived from these cases were codified in the statutory definition of "good faith." [39] The statutory examples in which "good faith" was excluded were in large measure restatements or elaborations of the principles or language derived from the cases decided under prior law. The development of "good faith" continued, as did the recognition of its "generality" as a term with well recognized meaning, emphasized by the language of Chapter X.

As we have seen, Chapters XI, XII and XIII contained no "good faith" filing requirement. This "gap" was filled by the courts! !

The cases decided under XI and XII speak for themselves. Except for *Sumida*, 409 F.2d 654 (9th Cir. 1969), most of the judicial current flows in the same direction: to require "good faith" as a condition of the right to file and process the proceeding. How the *Sumida* court would have reacted to *Bolton Hall*, 432 F.Supp. 528 (D.C.Mass. 1977), *Mallard Associates*, 403 F.Supp. 1259 (S.D.N.Y.1979), or *Ira Haupt v. Klebanow*, 348 F.2d 907 (2d Cir. 1965) is a matter over which lawyers may disagree. In fact, the failure of the bankruptcy court to comply with the basic procedural requirements of Chapter XII mandated the reversal.[40] However, the trend of the current cases under Chapter XI and XII is to supply a "good faith" filing requirement by implication when confronted with rehabilitation or

---

**34.** *Stanley Drug Co.*, 22 F.Supp. 664 (1938 Pa.).

**35.** *Tenn. Publishing Co.*, 81 F.2d 463 (6th Cir. 1936); *Provident Mut. Life Ins. Co. v. University L. Ev. Church*, 90 F.2d 992 (9th Cir. 1937); *First Nat'l Bank v. Conway Road Estates Co.*, 94 F.2d 736 (8th Cir. 1938).

**36.** *Wright v. Vinton Branch*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

**37.** *See* cases collected in *Wright v. Vinton Branch, supra*, especially footnote 6 at page 462, footnote 6 at page 562.

**38.** *John Hancock Life Ins. Co. v. Bartels*, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939).

**39.** Bankruptcy Act, Section 146(3).

**40.** "Thus, adherence to the normal procedure in Chapter XII cases should not produce any inordinate delay, and there is always the possibility that facts will be brought out at the creditors' meeting, including the attitude of the creditors themselves, which will throw new light upon the proceeding. For this reason we think it better that the court adhere to the normal procedures prescribed in Chapter XII. We think the debtors are engaging in an exercise of futility and appreciate the trial court's desire to terminate the proceedings. Reluctantly the judgment is reversed and the case remanded." *Sumida v. Yumen*, 409 F.2d 654 at 660 (1969).

reorganization statutes which do not contain an *express* provision to that effect.[41]

### *Lack of good faith as grounds to dismiss a Chapter 11 case*

■ The provisions of the Code dealing with rehabilitation and reorganization must be viewed as direct lineal descendants of a legal philosophy solidly embedded in American bankruptcy law. Review and analysis of Sections 74, 75, 77, 77B, Chapters IX, X, XI, XII and XIII, and cases decided under these sections, disclose a common theme and objective: avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy. That borderline is patrolled by courts of equity,[42] armed with the doctrine of "good faith": the requirement that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law must do so in a manner consistent with the aims and objectives of bankruptcy philosophy and policy—must, in short, do so in "good faith."

> A court of equity may, in its discretion, in the exercise of the jurisdiction committed to it, grant or deny relief upon performance of a condition which will safeguard the public interest. These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization .... [43]

Conduct interdicted in the cases can be summarized as conduct which is inconsist-

ent with the underlying purposes and contemplation of the reorganization and rehabilitation process and constitutes a perversion of legislative intent. The cases analyzing these concepts and principals are as consistent with the purposes and objectives of Chapter 11 of the Code as with the prior legislative enactments from which the Code was derived. It would be more than anomalous to conclude that in consolidating the provisions of Chapters X, XI, and XII in Chapter 11 of the Code, Congress intended to do away with a safeguard against abuse and misuse of process which had been established and accepted as part of bankruptcy philosophy (either by statute or decisional law) for almost a century. "Good faith" must therefore be viewed as an implicit prerequisite to the filing or continuation of a proceeding under Chapter 11 of the Code.

### *Lack of good faith as "cause" for relief from stay*

■ Historically, the issue of the debtor's "good faith" in filing was often raised at the outset of the proceeding by entities whose financial interests were threatened by the delay and expense associated with processing a case through the bankruptcy court: senior and junior lienholders, bondholders, indentured trustees; in short, all whose financial stake in the debtor would be dissipated or destroyed by continued operation of the debtor's business, or by any procedure except immediate liquidation. Courts soon learned to expect the plea of the party seeking dismissal that its economic interests can be salvaged by immediate liquidation, but will be destroyed by the continuation of a proceeding which is doomed at the outset by the economics of the case.

The authors of the Code well understood the impact of the filing of the case, and the

---

**41.** *In re Colonial Realty Investment Co.*, 516 F.2d 154 (1st Cir. 1975); *Ira Haupt Co. v. Klebanow*, 348 F.2d 907 (2d Cir. 1965); *Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C. Mass.1977); *Mallard Associates*, 574 F.Supp. 1045 (S.D.N.Y.1979); *Mallard Associates*, 574 F.Supp. 1045 (S.D.N.Y.1975).

**42.** I.e., bankruptcy courts. *American Ins. Co. v. Avon Park*, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940); *SEC v. U. S. Realty Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Young v. Higbee Co.*, 325 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945).

**43.** *American Ins. Co. v. Avon Park*, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

potential for loss to those financially involved with the debtor. Substantial and significant provisions of the Code were created to protect the many diverse interests which surface at the outset of the case. [11 U.S.C. § 361 through 366; 11 U.S.C. § 305] The intent of the Code was to provide rules of fairness and equity to govern, adjust, and balance these conflicting rights; to permit the debtor's continued use, enjoyment and exploitation of property and assets essential to rehabilitation, but on terms which protect the rights of others. [H.R. 95–595, pp. 339–340, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6295–6296; 124 Cong.Rec. H11089]

Moreover, the Code structured an arena in which to litigate these matters expeditiously and efficiently *at the outset* of the case. Sections 362(d) and (e) and 28 U.S.C. § 1471(a) through (e) were designed to accommodate the needs of the litigants for immediate resolution of these disputes. Had such provisions been included in prior rehabilitation and reorganization sections of the law, the debtor's "good faith" in seeking relief in the bankruptcy court might not have been so painstakingly explored.

These provisions of the Code may be said to provide a remedy for the evil that the traditional motion to dismiss for "lack of good faith" was intended to eliminate. That remedy takes the form of the provisions of the Code (i) defining the basis upon which affected interests may be relieved from the impact of the Chapter 11, i. e., the stay; and (ii) conferring jurisdiction on the Chapter 11 court to hear and determine such disputes at the outset of the case. [Section 362(d) and (e); 28 U.S.C. § 1471(a)–(e)]

Those who seek such relief need only show "cause" [§ 362(d)(1)]. The Code expresses the matter as follows:

On request of a party in interest and after and a hearing, the court shall grant relief from the stay . . .

(1) for cause, including the lack of adequate protection . . . .

The most traditional challenge to the "good faith" of the debtor was mounted by secured creditors who sought to avoid the threat of serious and irreversible harm to their economic interests while the debtor plodded forward in search of a means of financial rehabilitation. The right to "adequate protection" as a condition to further restraint against lien enforcement and continued use or exploitation of the collateral is a statutory recognition of the seriousness of that threat and the legitimacy of the plea for relief. The echo of this plea, sounding through the cases under Sections 74, 75, 77B, and Chapters X, XI, and XII, is heard repeatedly in the courts now administering the new Chapter 11.

The Code has isolated and identified this type of litigation over the debtor's "good faith" in the provisions of Section 362(d)(1), which address the lack of "adequate protection" to a party seeking relief.

However, much of the case law relating to abuse of the bankruptcy process, or the rights of others, involved conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community. For example: willful and persistent failure to comply with the terms of the statute,[44] the use of the statute to defraud a wife,[45] or to escape the duty to support dependent children,[46] an intent to violate Alien Land Law of the state of debtor's residence,[47] the secretion of assets,[48] intent to escape the day of reckoning in the state court for proven acts of misconduct,[49] the loss of corporate charter and the right to do business, and the effort to re-

**44.** *Tinkoff*, 85 F.2d 305 (7th Cir. 1936).

**45.** *Brown*, 21 F.Supp. 935 (Iowa 1938).

**46.** *Gonzalez Hernandez Borgos*, 342 F.2d 802 (1st Cir. 1955).

**47.** *Kuye Takano*, 71 F.Supp. 79 (D.C.Cal.1947).

**48.** *Wisun & Golub*, 84 F.2d 1 (2d Cir. 1936).

**49.** *Klein's Outlet*, 50 F.Supp. 557 (S.D.N.Y. 1942); *Cook*, 104 F.2d 981 (7th Cir. 1939).

vive the lost business,[50] use of the statute to resolve disputes between principals or equity owners,[51] or where there is no need to reorganize,[52] or cases involving the "new debtor syndrome." [53]

The long and varied history of these types of disputes may be regarded as the backdrop for the "cause" provision in § 362(d)(1) of the Code in situations where "adequate protection" is not really the issue. The Code was drafted to permit the impact of the filing, i. e., the stay, to be relieved for *any* "cause"; that is, for *any* reason cognizable to the equity power and conscience of the court as constituting an abuse of the reorganization or rehabilitation process.[54]

The relief afforded by § 362(d) is essential to the structural symmetry of the Code: the equitable balance between the rights of debtors, creditors, and other interests affected by the ebb and flow associated with the reorganization and rehabilitative process. Preservation of this symmetry demands the availability of that relief whenever necessary to protect the integrity of that process.

Accordingly, and for the foregoing reasons, the debtor's lack of "good faith" in filing a case under Chapter 11 is "cause," independent of the existence or lack of adequate protection, to vacate the automatic stay under § 362(d)(1).

### 4. *The factual background*

Application of these legal principles requires an examination of the history of the debtor and its dealings with the plaintiffs and the real property in issue.

### *Victory Construction; and Devonshire Corp.*

Victory was formed in 1964. It engaged in business activities dealing with real estate until 1972. Thereafter, it was active in trading in securities until 1976, when it became dormant. Fred Roven owns 100% of the stock in Victory, and since 1977, served as its president and only financial officer.

Roven also owns 100% of the stock of Devonshire Corporation. In 1976, when Victory became inactive, Devonshire became active in real estate and securities transactions and Roven was and has continued as its principal officer and decision-maker. In 1979, Devonshire sought relief under Chapter XI under the Bankruptcy Act. Thereafter, Roven reactivated Victory as a vehicle for business activities and transactions.

During the period of its inactivity, Victory had no employees. While franchise tax returns were filed under California law, it is fair to say that Victory was a corporate shell until reactivated after Devonshire sought relief under Chapter XI. In essence, Devonshire was the corporate vehicle utilized by Roven for his business activities during the period of time when Victory was inactive.

Victory was reactivated in order to purchase the real property which is the subject matter of this action. At the present time, Victory employs a person to answer the phone and open the mail. Other than Roven, that is its only employee.

### *The acquisition of real property*

In December of 1979, a few months after Devonshire filed its Chapter XI proceeding, Roven became interested in the real proper-

---

**50.** *Piccadilly Realty Co.,* 78 F.2d 257 (7th Cir. 1935); *Sylvan Beach v. Koch,* 140 F.2d 852 (8th Cir. 1944); *Champ Brewing Co.,* 72 F.Supp. 764; *Doyle Mfg. Co.,* 77 F.Supp. 116 (N.D.N.Y. 1948).

**51.** *Dubladenhill v. Sharretts,* 375 F.2d 558 (4th Cir. 1967); *USA Motel Corp.,* 450 F.2d 499 (9th Cir. 1971).

**52.** *Southwestern Enterprises, Inc.,* 261 F.Supp. 721 (W.D.Ark.1966). *Tucker v. Texas American Syndicate,* 170 F.2d 939 (5th Cir. 1948).

**53.** *See* cases collected under "new debtor syndrome," p. 552 of the Appendix to this opinion.

**54.** *See* also cases cited in footnotes 11, 13 through 18, 20 through 23, 25 through 31, 34 and 35.

ty (which is the subject matter of this action) and which was at that time owned by the Leslie Linder's London Club, a debtor in a pending bankruptcy proceeding. It was subject to the liens described in paragraph 1 of this opinion. The secured creditors in that bankruptcy were seeking leave to foreclose these liens. Roven ascertained the amounts and status of the liens against the property, examined a title report on the property, and contacted the secured creditors directly. Specifically, he contacted JCB, Hadley, Green, and California Federal Savings & Loan (hereinafter "Cal Fed"). In addition, he discussed the property and the liens with the trustee in bankruptcy for Leslie Linder's London Club. He learned that the debts to secured creditors were in default, and that some of them, at least, had recorded notices of default. He familiarized himself with the litigation in which lienholders were seeking to vacate the stays and proceed with foreclosure. As a result of his investigation, he became fully aware of the condition of title and the amount and status of all of the liens on the property.

Roven recognized two alternatives in buying the property: (a) to obtain title free and clear, by paying off the lienholders; or (b) to obtain a quitclaim deed, i. e., to purchase, right, title and interest, subject to existing liens. The latter was his objective; and he entered into the option and sale agreement of December 3, 1979 with this in mind (Exhibit 6).[55] The purpose of obtaining the option was to secure time in which to negotiate an arrangement with the secured creditors, whereby they would extend the due dates and permit him to assume existing loans so that he could develop the property without the need to finance the purchase price of the land elsewhere.

Roven paid $5,000 to acquire the option, although he had not yet completed his investigation of the property, nor determined whether or not he could purchase it. The option was necessary in order to avoid losing the property to another purchaser.

Roven reactivated Victory for the purpose of entering into the option agreement and purchasing the property.[56]

At the time the option agreement was signed, Roven had not yet entered into any written or binding agreements with any of the secured creditors. He characterized the option as a $5,000 "crap shoot," because he had not yet concluded arrangements with the lienholders to prevent foreclosure. During all this time, and during his negotiations with the lienholders, he hoped to avoid having to advance substantial funds as front money cash in order to avoid foreclosure. He recognized that the existing liens were at low interest rates, and retention of these liens in place would enable him to finance the development of the property at low interest rates. He realized that new loans at current rates of interest would greatly increase the cost of the project, and would undoubtedly require substantial cash in order to proceed with the development.

*The experience and knowledge of Ashkenazy and Roven.*

Roven is an experienced real estate investor. He had prior experience in Chapter XI proceedings, in connection with the Devonshire Corporation.

Ashkenazy is also sophisticated in real estate matters. Since 1963, Ashkenazy's experience in the real estate business has included the building and renovating of apartment houses, condominiums, and tract homes. During this period, he has extensive experience in buying and selling real property, and the development and management of hotels and restaurants. He considers himself knowledgeable and experienced in real estate matters. Ashkenazy had prior experience in the bankruptcy court in connection with a Chapter XII proceeding relating to a hotel in Beverly Hills.

---

55. The option agreement refers on page 1, recital D, to the fact that the "buyer wishes to purchase the real property by assuming such liens, but needs time in which to negotiate with

holders of the liens on the real property terms for the assumption of the liens."

56. Victory executed the option agreement as the buyer.

*The exercise of the option*

Exercise of the option required Victory to pay $107,500 in cash (in addition to the $5,000 previously paid to obtain the option). Roven loaned all of these monies to Victory. No promissory note was prepared or executed in connection with the loans, nor has there ever been a discussion concerning the repayment or the rate of interest. No payments have been made and no dates set for repayment. The loans were made prior to the close of escrow on May 8, 1980.

Although Roven had negotiated with the lienholders, he had not entered into any written or enforceable agreements with any of them prior to exercise of the option. His discussions with Hadley, for example, were not reduced to writing; they now disagree over the terms negotiated between them.

Before exercising the option, Roven decided to develop a hotel project on the property. He estimated this would take approximately three years. Nevertheless, he made no feasibility studies, nor did he then seek the assistance of any appraisers, nor make any financing arrangements for the development, prior to exercising the option.

Between January 25 (the date the option agreement was executed) and March 24 (the date the option was exercised), Roven made no substantial progress in his negotiations with the lienholders. When the option was exercised, Roven understood that purchase of the property from the bankruptcy estate would effectively relieve the secured creditors from the stay against foreclosure.

*The evolution of the partnership with Ashkenazy*

In 1979, or early 1980, Roven contacted Ashkenazy concerning the real property. As a result of their discussions, a partnership was formed. It is based upon a "gentlemen's agreement"; there is no written partnership agreement. The terms of the partnership are as follows:

(i) Ashkenazy will contribute funds equal to those contributed by Victory, up to a limit of $130,000;

(ii) Ashkenazy will contribute $15,000 per month to service the debt on the property for a period of two or three years; and

(iii) These obligations of Ashkenazy are conditioned on Roven or Victory refinancing on the property. That is a condition precedent to Ashkenazy's duties to advance matching funds or monthly financing. Ashkenazy insisted on this condition when he learned of the status of the encumbrances. In Ashkenazy's view, sound investment policy on his part required Roven or Victory to arrange the refinancing before Ashkenazy's obligations to advance monies can be enforced.

The partnership agreement was entered into sometime prior to May 8, 1980, when the escrow was closed and Victory took title to the property.

The essence of the division of responsibilities in the partnership is that Roven has the obligation to arrange the financing and Ashkenazy will handle the design, building, and management of the project.

Approximately $30,000 has been spent by Ashkenazy's entities on the property to date; the property has been cleaned, air conditioning, electrical and plumbing repairs have been made, and the property has been rented from time to time. In addition, Ashkenazy is studying the best interim use of the property pending the hotel development. The $30,000 is part of the matching funds obligation under the partnership agreement.

Between May 8, when the property was acquired, and August 11, when the Chapter 11 was filed, Ashkenazy met with developers on several occasions; had preliminary plans drawn for a hotel; discussed zoning with the city; and explored the feasibility of a hotel project.

Ashkenazy feels it was a sound investment. One reason is the low interest rates on the existing liens. These rates, approximately 8% overall (except for the mechanic's liens which bear interest at the legal rate of 7%), are much more favorable than interest rates available on current financing. This is a major reason for his interest in the project. Another attractive feature is the limited amount of cash needed if

existing financing is kept in place. He also feels the cost per square foot is reasonable.

If the court orders payments as adequate protection, Ashkenazy will then decide what alternatives are available to him.

From Roven's point of view, the deal with Ashkenazy was necessary to obtain the funds to pay the cost of servicing the debt, up to $15,000 a month. This is the approximate amount of interest payments required if existing liens remain in place. However, Victory did not have these funds. Roven structured the deal with Ashkenazy by determining the amount of funds necessary to service the existing liens on an interest only basis. No other funds are available to Victory to service the debt except the monies obtained from Ashkenazy.

The Ashkenazy-Roven partnership statement was filed of record (as required by California law) on August 11, 1980, the date this Chapter 11 proceeding was filed. The partnership was formed when the prospect of litigation was clearly foreseen. In the absence of agreement, litigation would be necessary in order to stay foreclosure of the liens.

*The value of the property*

There is a two-story building on the property, having approximately 18,000 square feet. Zoning changes will be required in order to use the property for hotel purposes. No application for zoning change or variance has yet been made.

The net lease revenue from the property to date has been approximately $2,000 per month.

Roven asserts that the fair market value of the property is $3.2 million. In his opinion, the land alone is worth $2.2 million, and the existing structure on the land is worth $1 million. In connection with this view:

(i) He assumes a different zoning on the parcel, together with a parking variance;

(ii) He is aware of present easements and assumes that they will be cleared for the intended use of the property, and has not excluded or reduced his valuation based upon the cost of removing the easements;

(iii) He acknowledges that his opinion is a "horseback appraisal."

The appraiser testified that the land has a present fair market value of $2.1 million, and that its liquidation value is between 80% and 100% of that. He appraises the land and building together at $2.46 million, and asserts that the liquidation value to be between 80–100% of that figure. Assuming the property zoning is converted as necessary and the easement problems are solved, he values the property at $2.76 million.

The partnership interest of Victory is not listed on its schedules. Roven feels that the value of the partnership interest is contingent upon the outcome of this litigation.

*Litigation to stay foreclosure*

Following the close of escrow, May 8, 1980, Hadley was released from the stay against foreclosure, and proceeded to notice the sale on his deed of trust. Victory filed suit in the Superior Court to enjoin the foreclosure sale by Hadley; but on July 18, 1980, the Superior Court refused to enjoin Hadley's foreclosure sale. Hadley fixed August 12, 1980 as the date for the foreclosure sale.

On August 11, 1980, this Chapter 11 proceeding was filed, and the plaintiffs (including Hadley) were stayed from lien enforcement.

In the Superior Court proceeding, counsel for Victory asserted in argument to the court that Victory was prepared to post a $1.5 million cash bond, in order to obtain the injunction against foreclosure by Hadley. Roven asserts, that in his view, Ashkenazy would have backed that bond.

5. *Did the debtor act in "good faith"*

■ The conduct of the debtor may be summarized as follows:

Prior to the acquisition of the real property in issue on March 24, 1980, the debtor was a dormant corporation, substantially without assets or income, and engaged in no business activities.

On that date, it acquired a quitclaim deed to the real property valued at between $2,760,000 and $3,300,000, (i) subject to sev-

en liens securing an aggregate indebtedness of approximately $2,900,000; (ii) which had a rental income of approximately $2,000 per month; (iii) and required an expenditure of $15,000 per month to service payments of interest only on the existing liens (without payment of principal); (iv) all of which liens were then in default and foreclosure, stayed only by the automatic stay resulting from bankruptcy proceedings of the former owner; (v) for a purchase price of $107,500, all of which was borrowed from its president and sole shareholder.

The debtor purchased the property (i) fully aware that all stays against lien enforcement resulting from the seller's bankruptcy would terminate on passage of title to the debtor, and (ii) without having concluded any enforceable agreements with the lienholders whereby terms of payment were extended or foreclosure efforts were stayed, or deferred.

The purchase was concluded at a time when the debtor had no financial assets, net worth, or enforceable commitments which would enable it to make the payments required to existing lienholders.

The purchase was made with knowledge that the interest rates on the existing liens were far below current interest rates in the real estate market, and with the intent to finance the acquisition of the property by keeping these liens in place with a minimum amount of front money cash.

At the time of the purchase, the debtor knew and intended that litigation would be instituted to prevent foreclosure of the property in the event the negotiations with the lienholders failed.

When negotiations failed, the debtor filed suit (in July 1980) in the state court to enjoin foreclosure. When that litigation proved unsuccessful, and a foreclosure sale was fixed (August 12, 1980), the debtor filed this petition under Chapter 11 of the Code (August 11, 1980).

At no time since acquiring title to the property has the debtor made any payments to the lienholders-plaintiffs in this adversary proceeding.

These facts and circumstances support the following conclusions:

The debtor is attempting to use the provisions of Chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business.

The debtor knowingly and with full awareness of the economic risks embarked on a speculative real estate promotion, the keystone of which was the ability to retain existing low interest liens in place.

This course of conduct was pursued with knowledge that the failure of negotiations with lienholders would leave litigation as the only means available to delay foreclosure (except for payment of the amounts in default).

The debtor was operated and guided by persons with shrewd and sophisticated appreciation of (i) the financial realities of the real estate market and real estate finance, (ii) the types of legal recourse available to forestall or delay foreclosure, and (iii) the loss, expense, delay and attrition to secured creditors associated with litigation of the sort contemplated by debtor if negotiations with the lienholders failed.

This Chapter 11 proceeding is primarily motivated by the desire to protect and preserve the existing low-interest liens on the property as a means of financing the acquisition with a minimum of front money cash.

Accordingly:

1. This is not a proceeding within the contemplation, intent, or purpose of Chapter 11 of the Code.

2. The debtor has acted with the intent to take advantage of the secured creditors' exposure to delay, loss, expense and attrition incident to further prolonged litigation to enforce their rights against the collateral, and has not acted with that candor, frankness, sincerity and willingness to do equity which are the indicia of "good faith".

3. The purchase of a quitclaim to fully encumbered property on the eve of foreclosure, with intent to use Chapter 11 to delay

the secured creditors in enforcement of their rights, is inconsistent with the purpose, spirit, and intent of the statute, under the facts and circumstances here presented.

4. The analysis and principles expressed by the courts called upon to deal with the good faith issue in cases relating to the "new debtor syndrome" fully support the determination that the debtor did not act in good faith in filing this Chapter 11 petition.

5. There is neither a going business nor going concern value to preserve or protect in this case, and the preservation of this speculative venture should not be undertaken at the expense of secured creditors.

6. The debtor has purchased its way into court. Justice, equity and public policy prohibit this.

7. The petition was not filed with a genuine intent and desire to use the provisions of Chapter 11 for its intended purpose, but solely to prevent foreclosure while the debtor created a vehicle for profit through use of the secured creditors' collateral at low interest not currently available in the real estate market. That is a misuse of the reorganization process. The Code is not to be abused by the extension of its rights and privileges to those not within its contemplation.

### 6. *Conclusion*

Plaintiffs are entitled to immediate relief from all stays against enforcing their respective rights against the collateral. This relief being granted, dismissal of the debtor's petition, under the circumstances here present, will serve no constructive purpose.[57]

SO ORDERED![58]

### APPENDIX

Cases dealing with "good faith" in the context of Section 12:

a. Inequitous or unfair result:

*Rider,* 96 Fed. 808 (N.D.N.Y.1899); *Frear,* 120 Fed. 978 (N.D.N.Y.1903).

b. "Trifle with the court"—contrary to spirit of statute:

*Cockshaw,* 220 Fed. 239 (S.D.N.Y.1915).

c. Express, willful violation of agreement:

*In re Blossom Products, Inc.,* 4 F.Supp. 696 (S.D.N.Y.1933).

d. Unexplained shrinkage of assets:

*Weintrob,* 240 Fed. 532 (E.D.N.C.1917); *Riley v. Pope,* 186 Fed. 857 (S.D.Ga. 1911).

e. Concealment of financial condition:

*In re Barde,* 207 Fed. 654 (D.Ore.1913).

f. Fraudulent transfers, preferences:

*In re McLellan,* 204 Fed. 482 (N.D.N.Y. 1913); *Adler v. Jones,* 109 Fed. 967 (6th Cir. 1901).

Cases dealing with "good faith" in the context of Section 74:

a. Abuse of purpose of the statute:

*Cosgrave,* 10 F.Supp. 672 (C.D.Cal. 1935).

b. Inability to fulfill objectives of the statute:

*Sterba,* 74 F.2d 413 (7th Cir. 1935).

c. Protective cover for fraudulent design:

*Collins,* 75 F.2d 62 (8th Cir. 1934); *Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932).

d. Willful failure to comply with the statute:

*Tinkoff,* 85 F.2d 305 (7th Cir. 1936).

e. Purpose to delay creditors by proposal beyond debtor's power to perform:

*Hill v. Topeka Morris Plan,* 105 F.2d 299 (10th Cir. 1939).

f. Honesty not enough:

*Augustyn,* 87 F.2d 577 (7th Cir. 1937).

g. The purpose and spirit of the Act utilized by those within its contemplation:

*Platt v. Schmitt,* 87 F.2d 437 (8th Cir. 1937).

---

**57.** In view of this disposition of the case, there is no need to deal with the plaintiffs' contentions concerning adequate protection.

**58.** This memorandum opinion shall constitute findings of fact and conclusions of law, as provided in R.752(a).

h.  Deliberate attempt to mislead the court for purpose of delay:
*Sieben*, 89 F.2d 935 (7th Cir. 1937).

Cases dealing with "good faith" in the context of Section 75:

a.  Purpose not intended by Congress:
*In re Fullagar*, 8 F.Supp. 602 (N.Y. 1934).

b.  Failure to make fair, frank disclosure:
*In re Wilkin*, 8 F.Supp. 222 (S.D.Iowa 1934).

c.  Take advantage of Act for ulterior purpose:
*Paul*, 13 F.Supp. 645 (C.D.Iowa 1936).

d.  Candor, frankness, sincerity, willingness to perform; not mere perfunctory compliance within letter of the law:
*In re Vater*, 14 F.Supp. 631 (E.D.Ky. 1936).

e.  Delay while waiting for upturn in the market:
*Noble*, 19 F.Supp. 504 (D.N.J.1937); *Brewster*, 20 F.Supp. 789 (W.D.La. 1937); *Cresap*, 99 F.2d 722 (7th Cir. 1938).

f.  Control of class of claims to the prejudice of creditors:
*Brewster*, 20 F.Supp. 789 (W.D.La. 1937).

g.  Delay to retain and "milk" the assets:
*Olsen*, 21 F.Supp. 504 (Iowa 1937).

h.  To defraud wife:
*Brown*, 21 F.Supp. 935 (Iowa 1938).

i.  Solely for purpose of delay:
*Lemm v. Northern Cal. Nat'l. Bank*, 93 F.2d 709 (9th Cir. 1937).

j.  No legitimate purpose of the Act will be served:
*Henderson*, 100 F.2d 820 (5th Cir. 1938).

k.  Secret advantages to favored creditors or other improper or fraudulent purpose:
*John Hancock Life Ins. Co. v. Bartels*, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939).

l.  No reasonable hope of rehabilitation—pre-*Bartels*
*Wright v. Vinton Branch*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

m.  No reasonable hope of rehabilitation—post-*Bartels*:
*Mahaffey*, 34 F.Supp. 760 (W.D.N.Y. 1940); *Zumkehr*, 108 F.2d 448 (7th Cir. 1939).

n.  Purchase of naked title on eve of foreclosure:
*Ripley*, 40 F.Supp. 850 (W.D.Mo.1941).

o.  Intent to protect violation of State land law:
*Kuye Takano*, 71 F.Supp. 79 (D.C.Cal. 1947).

Cases dealing with "good faith" in the context of Chapter IX:

a.  Fair bargain openly arrived at and devoid of overreaching:
*Town of Bell Eair*, 132 F.2d 542 (5th Cir. 1942).

b.  Lack of full and complete disclosure:
*American Ins. Co. v. Avon Park*, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

Cases dealing with "good faith" in the context of Section 77B:

a.  Actual intent and purpose to effect a reorganization:
*In re Southcoast Co.*, 8 F.Supp. 43 (Del. 1934).

b.  Not truly a creditor's petition:
*Philadelphia Rapid Transit Co.*, 8 F.Supp. 51 (E.D.Pa.1934).

c.  Futile!  No reorganization plan possible:
*New York Title & Mortgage Co.*, 9 F.Supp. 319 (N.D.N.Y.1934).

d.  Plan can be formulated later:
*In re Kelly Springfield Tire Co.*, 10 F.Supp. 414 (1935 Md.).

e.  To save sinking debtor from drowning:
*In re Kelly Springfield Tire Co.*, 10 F.Supp. 414 (1935 Md.).

f.  No precise definition—look to court's discretion:
*Prairie Ave. Bldg. Corp.*, 11 F.Supp. 125 (Ill.1935).

g.  Some possibility of a successful reorganization:

*2747 Milwaukee Ave. Bldg. Corp.*, 12 F.Supp. 557 (1935 N.D.Ill.). *Grigsby-Grunow*, 77 F.2d 200 (7th Cir. 1935); *Provident Mutual Life Ins. Co. v. University Ev. L. Church*, 90 F.2d 992 (9th Cir. 1937); *Detroit Trust Co. v. Campbell River Timber Co.*, 98 F.2d 389 (9th Cir. 1938); *Snyder v. Fenner*, 101 F.2d 736 (3d Cir. 1939); *In re Mt. Forest Fir Farms of America*, 103 F.2d 69 (6th Cir. 1939); *White v. Pennelas Mining Co.*, 105 F.2d 726 (9th Cir. 1939).

h. Corporation formed to acquire property on eve of foreclosure:
*In re Francfair, Inc.*, 13 F.Supp. 513 (1935 N.Y.).

i. Going concern value already eliminated:
*In re Dutch Woodcraft Shops*, 14 F.Supp. 467 (Mich.1935).

j. Prompt submission of a Plan:
*Phila. Rapid Transit Co.*, 16 F.Supp. 941 (Pa.1936).

k. No alternative to immediate liquidation:
*Stanley Drug Co.*, 22 F.Supp. 664 (1938 Pa.).

l. Parties cannot buy their way into court:
*In re Hudson Coal Co.*, 22 F.Supp. 768 (1938 Pa.).

m. Purity of motives insufficient:
*Hudson Coal*, 22 F.Supp. 768 (1938 Pa.).

n. Honesty and good intentions insufficient:
*Manati Sugar Co. v. Mock*, 75 F.2d 284 (2d Cir. 1934).

o. Financial salvation based on abiding faith in miracles:
*Tenn. Publishing Co.*, 81 F.2d 463 (1936 6th Cir.); *Provident Mut. Life Ins. Co. v. University Ev. L. Church*, 90 F.2d 992 (9th Cir. 1937); *First Nat'l. Bank v. Conway Road Estates Co.*, 94 F.2d 736 (1938 8th Cir.).

p. Individuals clothed in corporate garb to take advantage of the statute:
*North Kenmore Bldg. Corp.*, 81 F.2d 656 (1936 2d Cir.). *Knickerbocker Hotel Co.*, 81 F.2d 981 (7th Cir. 1936);

*Milwaukee Postal Bldg. Corp. v. McCann*, 95 F.2d 948 (8th Cir. 1938).

q. The debtor that secretes assets:
*Wisen & Golub, Inc.*, 84 F.2d 1 (2d Cir. 1936).

r. Is it to delay creditors or to invoke the operation of the statute in the spirit intended by Congress?
*Loeb Apartments*, 89 F.2d 461 (7th Cir. 1937).

s. Visionary or unpracticable schemes for resuscitation:
*O'Connor v. Mills*, 90 F.2d 665 (8th Cir. 1937).

t. The potential that a plan can be filed which is fair, equitable, and feasible:
*Wayne United Gas Co. v. Owens-Ill. Glass Co.*, 91 F.2d 827 (4th Cir. 1937).

u. No reasonable possibility the debtor can conform to or obtain benefit of the statute:
*R. L. Witters Assocs. v. Ebsary Gypsum Co.*, 93 F.2d 746 (5th Cir. 1938); *Price v. Spokane Silver & Lead Co.*, 97 F.2d 237 (8th Cir. 1938).

v. Liquidation more advantageous to creditors:
*Hickey v. Ritz-Carlton Restaurant and Hotel Co.*, 96 F.2d 748 (3d Cir. 1938).

w. To escape the day of reckoning for proven acts of misconduct:
*In re Cook*, 104 F.2d 981 (7th Cir. 1939).

x. Promises to the court broken—solicitations misleading:
*In re Fuller Cleaning & Dyeing Co.*, 118 F.2d 978 (6th Cir. 1941).

y. Pendency of consent receivership in other court:
*New England Coal & Coke Co. v. Rutland R. R. Co.*, 143 F.2d 179 (1944 2d Cir.).

z. Acquisition of claims to achieve veto power over plan:
*Texas Hotel Securities v. Waco Development Corp.*, 87 F.2d 395 (5th Cir. 1936).

aa. Prior loss of corporate charter and cessation of business activities:
*Antone Bldg. Corp.*, 88 F.2d 329 (7th Cir. 1937).

bb. Dispute between equity owners:
Piccadilly Realty Co., 78 F.2d 257 (7th Cir. 1935).

Cases dealing with "good faith" in the context of Chapter X:

a. Misuse or abuse of the legislative intent:
In re Southern Land Title Corp., 301 F.Supp. 379 (E.D.La.1969).
In re Metropolitan Realty Corp., 433 F.2d 676 (5th Cir. 1970).

b. Insolvent—no working capital—present assets dissipating—no plan presently possible:
Business Finance Corp., 451 F.2d 829 (3d Cir. 1971).

c. Going concern value to be saved:
Holi-Penn, Inc., 535 F.2d 841 (3d Cir. 1976).

d. Hopeless insolvency—liquidation the only expedient:
Goodman v. Michael, 280 F.2d 106 (1st Cir. 1960); REA Holding Corp. v. Manning, 558 F.2d 1127 (2d Cir. 1977); Fidelity Assurance Assn. v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943).

e. Dispute between the principals:
Dubladenhill v. Sharretts, 375 F.2d 558 (4th Cir. 1967); U.S.A. Motel Corp., 450 F.2d 499 (9th Cir. 1971).

f. Apparent equity for bondholders and junior lienors:
Equity Co. of America, 115 F.2d 570 (7th Cir. 1940); In re Lela & Co., 551 F.2d 399 (D.C.Cir.1977).

g. No need to reorganize:
Tucker v. Texas American Syndicate, 170 F.2d 939 (5th Cir. 1948); Southwestern Enterprises, Inc., 261 F.Supp. 721 (W.D.Ark.1966).

h. Speculation on an upturn in the market:
Liberty Mortgage Corp., 245 F.Supp. 858 (E.D.Ohio 1965).

i. New debtor syndrome:
The "good faith" issue has arisen in a number of cases in the context of a transfer of assets to the debtor immediately prior to the filing of the proceeding. In some cases, the debtor is an individual, in others, a corporation newly formed or lately revitalized for the purpose of receiving the transfer of the assets. These cases, having in common circumstances which may be described as the "new debtor syndrome," examine "good faith" in its application to many different provisions of prior bankruptcy law, i. e., Sections 74, 75, 77B, Chapter X, etc. These cases include the following:

In re Cosgrave, 10 F.Supp. 672 (1935)—§ 74;
In re Collins, 75 F.2d 62 (8th Cir. 1934)—§ 74;
In re Fullagar, 8 F.Supp. 602 (N.Y. 1934)—§ 75;
In re Francfair, Inc., 13 F.Supp. 513 (N.Y.1935)—§ 77B;
In re Hudson Coal Co., 22 F.Supp. 768 (Pa.1938)—§ 77B;
In re North Kenmore Bldg. Corp., 81 F.2d 656 (7th Cir. 1936)—§ 77B;
In re Knickerbocker Hotel Co., 81 F.2d 981 (7th Cir. 1936)—§ 77B;
In re Loeb Apartments, 89 F.2d 461 (7th Cir. 1937)—§ 77B;
Milwaukee Postal Bldg. Corp. v. McCann, 95 F.2d 948 (8th Cir. 1938)—§ 77B;
Mongiello Bros. Coal Corp. v. Houghtaling Properties, 309 F.2d 925 (5th Cir. 1962)—Chapter X.
In re Metropolitan Realty Corp., 433 F.2d 676 (5th Cir. 1970)—Chapter X.
Matter of Northland Const. Co., 560 F.2d 756 (7th Cir. 1977)—Chapter X.
Mallard Associates, 463 F.Supp. 1259 (S.D.N.Y.1979)—Chapter XII.
Mallard Associates, 475 F.Supp. 1045 (S.D.N.Y.1979)—Chapter XII.

j. Selfish is not ulterior:
In re Pinehill Collieries, 46 F.Supp. 669 (Pa.1942); Frank Fehr Brewing Co., 268 F.2d 170 (6th Cir. 1959);

k. Can escape state court jurisdiction in good faith:
325 E. 72nd Street, 53 F.Supp. 997 (S.D. N.Y.1944).

l. At outset of case, good faith is easier to establish:

*DCA Development Corp.*, 360 F.Supp. 162 (D.C.Mass.1973); *Delta Food Processing Corp.*, 313 F.Supp. 788 (N.D. Miss.1970).

m. Secured creditors say "no" at outset:

*Delta Food Processing Corp.*, 313 F.Supp. 788 (N.D.Miss.1970).

n. Loss of corporate charter:

*Capital Endowment v. Kroeger*, 86 F.2d 976 (6th Cir. 1936)—77B; *Surf Bldg. Corp.*, 11 F.Supp. 295 (Ill.1934)—77B; *In re Antone Bldg. Corp.*, 88 F.2d 329 (7th Cir. 1937)—77B.

o. Abiding faith in miracles—the creditor's credo:

*In re Southwestern Enterprises, Inc.*, 261 F.Supp. 721 (W.D.Ark.1966); *Provident Mut. Ins. Co. v. University Ev. L. Church*, 90 F.2d 992 (9th Cir. 1937); *Tenn. Pub. Co.*, 81 F.2d 463 (6th Cir. 1936)—77B.

p. Purpose of reviving a lost business:

*Sylvan Beach v. Koch*, 140 F.2d 852 (8th Cir. 1944); *Champ Brewing Co.*, 72 F.Supp. 764 (D.Penn.1947); *Doyle Mfg. Co.*, 77 F.Supp. 116 (N.D.N.Y.1948).

q. Fraudulent or improper purpose:

*Marine Transit Corp.*, 79 F.2d 232 (2d Cir. 1935); *Zeitinger v. Hargadine-McKittrick Dry Goods Co.*, 244 Fed. 719 (8th Cir. 1917); *In re Klein's Outlet*, 50 F.Supp. 557 (S.D.N.Y.1942); *International Brotherhood, et al. v. Quick Charge*, 168 F.2d 513 (10th Cir. 1948).

Cases dealing with "good faith" in the context of Chapter XI:

a. Full and accurate disclosure to creditors committee:

*In re Gilchrist*, 410 F.Supp. 1071 (1976).

b. Confirmation fraudulently procured:

*Matter of 20546 Corp.*, 408 F.Supp. 959 (S.D.N.Y.1976).

c. Debtor in possession's failure to maximize assets as lack of good faith in proposing a plan:

*In re Stanley Karman, Inc.*, 279 F.Supp. 828 (N.Y.1967).

d. Abuse of provisions, purpose, or spirit of the chapter:

*In re Village Men's Shops, Inc.*, 186 F.Supp. 125 (Ind.1960).

e. The Chapter X filing requirement applied in Chapter XI:

*Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C.Mass.1977).

f. A more relaxed Chapter X filing standard applied in Chapter XI:

*Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C.Mass.1977).

g. No prospect of rehabilitation:

*SEC v. U. S. Realty, et al.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Ira Haupt & Co. v. Klebanow*, 348 F.2d 907 (2d Cir. 1965).

Cases dealing with "good faith" in the context of Chapter XII:

a. *Roseate* hope of financial salvation—where plan is a gesture:

*Iden v. N. Y. Life Ins. Co.*, 107 F.2d 695 (4th Cir. 1939).

b. Plan which ignores duty to dependent children:

*Gonzalez Hernandez Borgos*, 343 F.2d 802 (1st Cir. 1965).

c. The Chapter X filing requirement applied in Chapter XII:

*Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C.Mass.1977).

d. A more relaxed Chapter X filing standard applied in Chapter XII:

*Colonial Realty*, 516 F.2d 154 (1st Cir. 1975); *In re Southern Land Title*, 301 F.Supp. 379 (E.D.La.1969); *Ware Metal Products*, 42 F.Supp. 538 (D.Mass.1941); *Holi-Penn, Inc.*, 535 F.2d 841 (3rd Cir. 1976); *Bolton Hall Nursing Home*, 432 F.Supp. 528 (D.C.Mass.1977).

e. The Chapter X filing requirement in Chapter XII—New debtor syndrome as fraudulently invoking jurisdiction of the court—"bad faith":

*Mallard Assocs.*, 463 F.Supp. 1259 (S.D. N.Y.1979); *Mallard Assocs.*, 475 F.Supp. 1045 (S.D.N.Y.1979).

f. Announced refusal of sole secured creditor at outset of proceeding:

*Mallard Assocs.*, 475 F.Supp. 1045 (S.D. N.Y.1975).

g. No Chapter X filing requirement where Chapter XII statutory procedures are ignored:
*Sumida v. Yumen*, 409 F.2d 654 (9th Cir. 1969).